# CANTON LUMBER COMPANY *vs.* WM. A. LILLER.

*Part of the Goods Delivered by Seller Not According to Contract— Right of Buyer to Accept Part Only—Measure of Damages for Failure to Deliver all the Goods Sold—Sale Subject to Inspection by Third Party—When Act of Third Party is Conclusive—Evidence— Usages.*

If a large quantity of lumber is sold and shipped to the buyer for use in another State, and when there inspected, a part of it is found not to conform to the specifications of the contract, the buyer is not bound to accept or reject all of the lumber, but he may accept that part of it which complies with the contract, while rejecting the other part.

When only part of the goods delivered by the seller are in conformity with the contract, the acceptance of such part by the buyer does not disentitle him to claim damages from the seller for his failure to perform the entire contract.

The defendant, a lumber company, contracted to supply the plaintiff with a certain quantity of lumber to be used for the erection of a coal tipple and other structures in West Virginia, which the plaintiff had agreed to build for a railway company. The contract between plaintiff and defendant provided that the lumber should conform to certain specifications, and also, according to plaintiff's evidence, that it should be subject to the railway company's inspection, but the existence of this latter condition was denied by the defendant. The specifications of the lumber to be used, as contained in plaintiff's contract with the railway company, differed but little from those in the contract between plaintiff and defendant The greater part of the lumber furnished by the defendant was rejected by the railway company's inspectors, but that part of it which was passed by them was used by the plaintiff, and the rejected part was taken away by the defendant. In order to comply with his contract with the railway company, plaintiff was obliged to purchase other lumber at a price in excess of that named in the defendant's contract, and suffered other losses on account of the delay, and this action was brought to recover such damages. The defendant contended that the railway company's agents required, under their inspection, a higher quality of lumber than that called for by the contract of the defendant, and also that the plaintiff was not entitled to accept and use a part of the lumber supplied, and reject the other part. *Held*, that the jury was properly instructed that if they found that the lumber was sold subject to the railway company's inspection, by which part of it was rejected, such inspection was conclusive upon the parties in the absence of fraud, and that there was no evidence in the case of any fraud or bad faith on the part of the inspectors.

*Held*, further, that the use by the plaintiff of part of the lumber was not an acceptance of all the lumber delivered, and not a waiver of his right to claim damages for defendant's failure to perform the entire contract.

*Held*, further, that if the railway company's agents were governed in their inspection by their own views of the fitness of the lumber for the purposes for which it was to be used, and did not inspect it by the specifications by which it was sold, then the inspection was not in accordance with the contract of sale, and the defendant is not thereby concluded.

Plaintiff contracted to erect buildings for a railway company and purchased from defendant lumber to be used for that purpose. In an action to recover damages for defendant's failure to supply lumber of the quality called for by the agreement, and at the time specified, plaintiff may offer evidence of the fact that he had such a contract with the railway company.

In such action, the defendant's agent may be asked if he did not know that in the case of such contracts made by the railway company the lumber used must be subject to its inspection.

When the question at issue is whether the articles supplied by the seller under his contract with the plaintiff were of a certain quality, evidence as to the kind of similar articles supplied to plaintiff by a third party is not admissible; nor is evidence admissible as to what articles of that kind were merchantable under certain regulations other than those governing the contract between the parties.

When a seller fails to supply to a builder materials of the quality and at the time called for by his contract, and the builder is obliged to purchase materials from other parties, and is delayed in the execution of his contract to build, he is entitled to recover as damages, the difference between the contract price for such materials, and that which he was required to pay in the open market, together with such expenses as the jury may find were necessarily incident to the delay in the completion of the work.

When it appears from the language of a contract that the parties intended that the buyer should have the right to accept delivery of any part of the goods sold, which were in conformity with the contract, while rejecting the other part, evidence of a usuage in conflict with such intention is not admissible.

If goods are sold according to certain specifications and subject to the inspection of a third party to ascertain if they conform to the specifications, then if such third party rejects the goods which comply with the specifications because they are not in his opinion fit for the proposed use, the seller is not bound by such inspection and rejection.

*Decided January 7th, 1908.*

Appeal from the Baltimore City Court (PHELPS, J.)

*Plaintiff's 1st Prayer.* —The jury are instructed that if they find from the evidence the Canton Lumber Company, the defendant, agreed to furnish to William A. Liller, the plaintiff, 409,943 feet of lumber for the erection of a coal tipple at Keyser, West Virginia; and if the jury further find that the Canton Lumber Company, the defendant, understood that all of said lumber was to be subject to B. & O. inspection; and if the jury further find that the Canton Lumber Company, the defendant, did furnish said lumber and that said lumber so furnished was inspected by the duly authorized inspector of the B. & O. Railroad Company and that said lumber or any part thereof was rejected, then such inspection and rejection, in the absence of fraud, was final and conclusive, so far as the rights of the parties to this action are concerned. (*Granted.*)

*Plaintiff's 2nd Prayer.* The jury are instructed that if they find from the evidence that between the dates of March 31st, 1903, and April 4th, 1903, inclusive, the defendant, the Canton Lumber Company, agreed to sell and deliver to the plaintiff, William A. Liller, on or before the first day of July, 1903, 409,943 feet of lumber to conform to the blue print specifications offered in evidence; and if the jury further find that said lumber so agreed to be furnished by the Canton Lumber Company to the said William A. Liller was subject to B. & O. inspection; and if the jury further find that the said Canton Lumber Company did furnish said lumber and that it was inspected by a duly authorized agent or inspector of the B. & O. Railroad Company and that a large part of said lumber was rejected or condemned by the B. & O. inspectors because it did not conform to the requirements of said blue print specifications; and if the jury further find that because of the failure of the Canton Lumber Company to furnish lumber which did not conform to the blue print specifications, if the jury so find, and which was not approved by the B. & O. inspectors and within the time agreed to be furnished, the plaintiff was required to purchase timber to take the place of the lumber

rejected by the B. & O. inspectors and was delayed in the erection of said coaling station and sand bins, then the plaintiff is entitled to recover the difference between the contract price agreed upon by the plaintiff and the defendant for the furnishing of said lumber, and that which the plaintiff was required to pay in the open market, together with such damages as the jury may find were necessarily incident to the delay in the completion of the work, not including any claim for damage by storm. (*Granted as modified.*)

*Plaintiff's 4th Prayer.* The jury are instructed that if they find from the evidence that the plaintiff used a part of the lumber agreed by the defendant to be furnished to the plaintiff, he did not, by such use of the part of the lumber, waive any claim for damages against the defendant for the failure on the part of the defendant to perform its obligations under the contract if they should find such failure. (*Granted.*)

*Plaintiff's 5th Prayer.* The jury are instructed that there is no legally sufficient evidence in this case to show fraud or bad faith on the part of the B. & O. inspectors in inspecting the lumber mentioned or referred to in this case. (*Granted.*)

*Plaintiff's 6th Prayer.* That there is no legally sufficient evidence in this case to show any prevailing custom affecting the rights of the parties to this suit. (*Granted.*)

*Plaintiff's 7th Prayer.* That if the jury find for the plaintiff in this case, the measure of damages is the difference between the contract price agreed upon by the defendant and the plaintiff for the furnishing of the lumber by the defendant to the plaintiff, and that which the plaintiff was required to pay in the open market together with such damages as the jury may find were necessarily or proximately incident thereto, not including any claim for damage by storm, and the jury in assessing damages may take into consideration any delay caused the plaintiff on account of the failure of the defendant to furnish said lumber according to the terms and within the time prescribed for the furnishing of said lumber, together with such expenses as the plaintiff may have incurred on account of such default and delay, if the jury find such default

and delay; and the jury, in their discretion, may allow interest from the date of the default of the defendant in furnishing said lumber. (*Granted as modified.*)

*Defendant's 1st Prayer.* That the plaintiff having alleged in his declaration that all of the lumber purchased by the plaintiff from the defendant in this case, and by the defendant delivered, was rejected by the Baltimore & Ohio Railroad, and the admitted and uncontradicted evidence in the case being that only a part of the lumber so purchased and delivered was rejected, the plaintiff is not entitled to recover upon the pleadings and evidence in this case. (*Refused.*)

*Defendant's 2nd Prayer.*—If the jury believe from the evidence that the plaintiff purchased of the defendant the various pieces of lumber mentioned in the order offered in evidence, amounting in the aggregate to four hundred and ten thousand feet at a round price of twenty dollars per thousand feet for lumber in the rough, and if dressed on one side, twenty dollars and fifty cents per thousand feet, and if dressed on four sides, twenty dollars and seventy-five cents per thousand feet and that the lumber so purchased was to be delivered by the defendant f. o. b. on railroad cars at the city of Baltimore and consigned to the plaintiff at Keyer, West Virginia, and that the lumber so purchased should be:

1. Lumber to be of good quality, free of large, unsound or loose knots, also free of sap or other defects which will materially affect its strength. It must be sawed true to dimensions and straight.

2. The kind of lumber used for different parts will be as follows, except when specially authorized otherwise:

Stringers and guard rails, Georgia yellow pine.

Cross ties, Georgia yellow pine or heart white oak.

Caps and sills, " " " " " " "

Legs, " " "

Bracing and girts, North Carolina Pine or first class Virginia Pine.

Blocking, G. Y. P. or N. C. P. or W. O.

3. Packing spools, washers and bolts as per sketch.

And that the lumber so purchased was loaded f. o. b. upon the railroad cars at the city of Baltimore and consigned to the plaintiff at Keyser, West Virginia, and upon its arrival at its destination was inspected by the agents of the Baltimore & Ohio Railroad and that the lumber so shipped was condemned by the said inspectors, and if the jury shall further find that notwithstanding such inspection and condemnation, the plaintiff proceeded to use and cut up and did so use and cut up a quantity of said lumber as his own property without the consent of the defendant, then such act of user on the part of the plaintiff was an acceptance of the whole quantity of lumber so delivered, and their verdict must be for the defendant. (*Refused.*)

*Defendant's 3rd Prayer.*—If the jury believe from the evidence that the plaintiff purchased of the defendant the various pieces of lumber mentioned in the order offered in evidence at a round price of twenty dollars per thousand feet for lumber in the rough, and if dressed on one side, twenty dollars and fifty cents per thousand feet, and if dressed on four sides, twenty dollars and seventy-five cents per thousand feet, and that the lumber so ·purchased was to be delivered by the defendant f. o. b. on railroad cars at the city of Baltimore and consigned to the plaintiff at Keyser, West Virginia, and that the lumber so purchased should be: (as set forth in defendant's 2nd prayer) and that the lumber so purchased was loaded f. o. b. upon the cars at Baltimore and consigned to the plaintiff at Keyser, West Virginia, and after its arrival the same was inspected by the agents of the Baltimore & Ohio Railroad at a higher standard of quality than that by which the same was sold, or if the jury shall believe that the inspectors inspected the lumber from their own ideas of its fitness for the purposes for which it was to be used, and did not inspect it by the specifications by which it was sold, then the inspection was not in accordance with the contract of sale and their verdict must be for the defendant.   (*Refused.*)

*Defendant's 4th Prayer.*—If the jury find from the evidence in this case that there was, at the time of the sale and delivery

of the lumber mentioned in this case (if.they should find such sale and delivery) a general well-known custom in the lumber trade whereby the conduct of a seller and buyer was governed or controlled in cases where lumber was sold and consigned to be delivered to the buyer under an agreement whereby the lumber upon inspection should conform in quality to certain written specifications by imposing on the vendee the duty if upon inspection only a part of the lumber conformed to the written specifications, to reject the whole of the lumber and notify the seller to that effect, and maintain the whole of the lumber intact until he should have received instructions from the seller as to its disposition, and also imposing upon the buyer, should he use or appropriate any part of the lumber so rejected without the consent of the seller, the obligation to accept the whole of the lumber, and the jury shall further find that such general well-known custom was known to the plaintiff or from his association and intercourse with the lumber trade he should have known such custom, and if the jury shall further find that the said lumber was sold and delivered as above mentioned, and that the plaintiff without the consent of the defendant did use and appropriate a part thereof notwithstanding said lumber was inspected and rejected, should the jury find the same to have so been inspected and rejected then such user and appropriation under such general, well-known custom was an acceptance of the whole of said lumber by the plaintiff, and their verdict must be for the defendant. (*Refused.*)

The cause was argued before BOYD, C. J., PEARCE, SCHMUCKER and BURKE, JJ.

*Francis T. Homer* and *Charles E. Siegmund* (with whom were *George R. Willis* and *Luther M. R. Willis* on the brief), for the appellant.

The pleadings aver that the lumber was rejected by the plaintiff. The evidence of the plaintiff himself shows that only a part of that statement was true; that irrespective of whether

the appellee could use the lumber, as it had only had a cursory inspection by the agents of the Baltimore and Ohio Railroad, accepted some 56,000 feet or approximately one-eighth of the amount required and cut it up, destroying it to the use of the appellant. It is, therefore, submitted, that so long as the declaration did not state the exact material facts the appellee thereby being deprived of such rights and remedies as he might have been able to maintain had the declaration given clearly and exactly the rejection of the lumber, that the variance is of such a materiality to the issue as to prove fatal.

The Court below erred in rejecting the second prayer of the appellant. The appellee by his own testimony had proved, on cross-examination, that he had used and destroyed some 56,000 feet, or one-eighth of the entire order, before final inspection by the Baltimore and Ohio Railroad; that he had been compelled to tear down and throw out a portion of said lumber after he had put it into place. But that none of said lumber had been used by him until after condemnation by the agents of the railroad.

In an entire contract the vendee who had warranty of quality has two roads open to him when such warranty has been violated. He can accept the entire lot and ask for a reduction in the contract price or he may reject the entire lot, but he cannot after inspection and acceptance of part of the shipment of goods refuse to pay for the remainder. *Crane & Co.* v. *Columbus Const. Co.*, 73 Fed. Rep. 984. "The seller is bound to deliver the quantity stipulated, and has no right either to compel the buyer to select a less quantity or to require him to select part out of a greater quantity." *Norrington* v. *Wright*, 115 U. S. 188.

Where the consignee retains some of the goods as acceptable, but insisted that the rest did not correspond with the warranty and were unmerchantable and re-shipped them, the seller refused to accept the goods and the defendant sold them at auction, the Court held that there had been no rescission of the contract without an offer to return the whole; that part acceptance was the acceptance of the whole. *Reuben et al.* v. *Sturtevant et al.*, 80 Fed. Rep. 930.

If the lumber was rejected about the first of August, as was testified by the appellee, and such inspection by the Baltimore and Ohio Railroad was final, and that he considered this as a refusal on his part to accept, he could not afterwards test the goods, such act being inconsistent with the right of rejection. It was impossible for him to reject the whole and use a part. *Cream City Glass Co.* v. *Frielander*, 84 Wis. 53.

It is an elementary principle of rescission that the party who rescinds must necessarily place the other party in *statu quo* in order to relieve himself of liability. "A rescission contemplates that both parties shall be placed in *statu quo*, and ordinarily the vendee who proposes to rescind the contract for their purchase, must rescind in toto." *Manufacturing Co.* v. *Wakefield*, 121 Mass. 190.

"A party will not be permitted to affirm a contract in part and rescind as to the residue. If he rescinds at all he must do so *in toto*. The opposite party must be placed in as good a condition as he was before the sale by a return of the property purchased, unless it is entirely worthless." *Hazfeld* v. *Converse*, 105 Ill. 534.

"The entirety of a contract is not destroyed by the circumstance that the subject of the sale is of such a uniform character as to be readily divisible proportionate by weight or measure, or is contained in packages of uniform quantity and value, even with the added circumstance that the consideration is named only by way of fixing the rate or price of the unit of such division." *Blank* v. *Baker*, 5 Metcalf, 452; *Maxfield* v. *Tragg*, 115 Mass. 350.

In other words, he may accept or rescind the contract, but when a part is accepted and another part rejected because not of the quality contracted for, it is not a rescission. *Pope* v. *Allis*, 115 U. S. 363.

The Supreme Court of Iowa, in speaking of a case whose facts conform precisely to the facts in this case, said: "The sole and only question for determination under the record before us, is whether the contract between these parties was entire or separable. As a general rule, it may be said that

the contract is entire when by its. terms, nature and purpose it contemplates and intends that each and all of its parts and consideration shall be common each to the other and interdependent. The question whether a given contract is entire or separable is very largely one of intention, which intention is to be determined from the language the parties have used and the subject-matter of the agreement.

"It is very difficult to lay down a rule which will apply to all cases, and consequently each case must depend very largely upon the terms of the contract involved. In this case we think it almost conclusive that the parties did not intend the contract in question to be separable. It is hardly conceivable that the plaintiff, living more than 2,000 miles away from the defendant's place of business should contemplate the shipment of a car load of lumber, although consisting of pieces of different dimensions with the understanding or intention that each piece of timber so shipped should constitute the basis of an independent contract, or that the consignee should be at liberty to reject any part of the lumber so shipped and retain the balance, nor is there anything in the contract itself indicating that the defendant had any thought that he was to receive any other than an entire car." *Pacific Timber Co.* v. *Iowa Windmill Co.*, 135 Iowa, 310.

If the vendor offers to deliver a less quantity than stipulated, the vendee is not bound to accept it, nor is he bound to accept a portion of a larger amount. The same that is true of quantity must be true of quality, and the contract must be performed according to both quantity and quality stipulated. *Salmon* v. *Boykin*, 66 Md. 541.

Therefore, the warranty that it was necessary for the appellant in this case to perform, namely: That the lumber delivered by the appellant to the appellee should conform to the specifications included in the contract between the parties was abrogated, for where the buyer has an opportunity to examine the thing sold there is no implied warranty in the absence of fraud that it shall be fit for the purpose for which it was bought. If the seller delivers things of the character and

quality represented by him at the time of the sale, he is entitled to recover the contract price even though they proved to be unsuitable for the buyer's use.   *Horner* v. *Parkhurst*, 71 Md. 110; *Hyatt* v. *Boyle*, 5 G. & J. 119; *Kellogg* v. *Hamilton*, 110 U. S. 114.

The inspection at Keyser, W. Va., by the agents of the Baltimore and Ohio Railroad Company was inspection by the appellee and although the appellant was from necessity of law required to deliver to the appellee such lumber as the contract called for, the warranty was ended by the inspection.

According to the well-known principles of law of warranty the remedies of a buyer when such is broken are:

1.   To refuse to accept the goods when offered;

2.   If he accepted them he may withhold payment and in an action by the seller set up the damages arising from breach of the warranty by way of recoupment, and

3.   He may refuse to accept, and sue for damages for the breach.   *The Warren Co.* v. *The Keystone Co.*, 65 Md. 547; *Adler* v. *Portner*, 65 Md. 27; *Applegarth* v. *Robinson*, 65 Md. 493.

But any one of such principles demands that the acceptance or rescission shall be in toto and not in part.   For it is the very basis of all contract law that either both parties must live up to the contract, or each must be put in *statu quo*.   For what is a warranty but a subsidiary promise?   *Horn* v. *Buck*, 48 Md. 370.

The return made in this cause of part of the lumber sent to Keyser by the appellant and acceptance of the same by him was not such an acceptance as would have acknowledged the right of the appellee to rescind the contract, thereby attaching liability to the appellant for the difference in price between that which the contract called for and that which the appellee was required to pay in the open market, for there is a well known principle of law that it is a duty of a party in such a case to do everything in his power to minimize the damages to which the other party to the contract is put.   *Lawson* v. *Price*, 45 Md. 123; *Keedy* v. *Long*, 71 Md. 385; *Warren* v. *Stewary*, 105 U. S. 229.

Md.]                    Argument of Counsel.

The prayer of the defendant, that if the jury believe that the inspection was not made according to the specifications, but according to a higher grade and according to the opinions and ideas of fitness for the purpose for which it was to be used of the Baltimore & Ohio Railroad officials, was wrongfully rejected.   1. Because the inspectors wilfully disregarded the contract in their inspection.   Or—2. That they so misconstrued the contract and exceeded their authority as to abrogate the contract between the parties, while the law requires that when the verdict of an inspector or engineer to whom the subject matter is referred as a condition precedent to its acceptance is impeached it is necessary for the party impeaching said verdict to prove one of three things: (*a*) Fraud; (*b*) Gross error amounting to fraud or bad faith; and (*c*) A misconstruction of the contract. *G. H. & S. A. R. R. Co. v. Dilley*, 65 Texas, 691.

When the engineer's estimates are fairly made in accordance with the meaning pointed out in the contract they are binding, and when not fairly made they are not binding.  *Norfolk, etc., Railroad Company v. Mills & Fairfax*, 91 Va. 643; *Alton, Mt. Carmel and New Albany R. R. Co. v. Northcroft*, 15 Ill. 49.

It is a question for the Court to decide and accordingly infer any wrongful construction of any provision of the contract made by the inspector for the reason that the parties did not make the decision of the inspector after the proper interpretation of the contract final and conclusive.   Such is the province of the Court.  *Lewis v. Chicago, S. F. & C. R. R. Co.* 49 Fed. Rep. 708; *G. H. & S. A. Ry. Co. v. Dilley*, 65 Texas, 691; *Lynn v. Balto. & O. R. R.*, 60 Md. 407.

On the first exception counsel cited: *Baker v. Gunther*, 53 Md. 373; on the second exception, *B. & O. R. Co. v. Stewart*, 79 Md. 487; on the fifth exception, *Patterson v. Crowther*, 70 Md. 124; *Vandemeator v. R. R. Co.* 27 Vt. 130; *Water Co. v. Gray*, 6 Metcalf, 31.

*Alonzo L. Miles* and *Wm. E. Ambrose*, for the appellee.
While there are eight bills of exceptions, some of which

are based upon the admissibility of the testimony, and others upon the granting of the plaintiff's prayers and the rejection of the prayers offered by the defendant, they involve, but three questions of law.

*First.* Assuming, that the appellant agreed to sell and deliver and did deliver to the appellee a certain quantity of lumber subject to inspection by the inspectors of the Baltimore and Ohio Railroad Company, and that said lumber was inspected by the duly authorized inspectors of the Baltimore and Ohio Railroad Company, and by them rejected, was not said inspection conclusive of the rights of the parties under the contract?

*Second.* Did the acceptance and use of part of the lumber by the appellee preclude him from declining to accept the residue after it had been inspected and rejected by the B. & O. inspectors under the terms of the contract?

*Third.* Is there any legally sufficient evidence in this case to show any prevailing custom affecting the rights of the parties to the contract?

1. Where goods are sold by one person to another subject to inspection of a third person, there should be evidence of his determination, and inspection duly had under such a contract is conclusive. *Abbott's Trial Evidence*, page 390; *Severcool v. Farewell*, 17 Mich. 308; *Columbian Iron Works* v. *Douglas*, 84 Md. 44-65.

In *Severcool* v. *Farewell*, Severcool agreed to deliver to Farewell, on the Michigan Central Railroad dock, in Detroit, two hundred thousand feet of boards of specified sizes, kinds and dimensions, "said lumber to be inspected by W. E. Warriner, or some competent inspector whom he might choose." The Court said: "It was insisted by the defendant below, that the contracts did not make the inspection of the lumber conclusive upon the parties; and he offered evidence tending to show that some of the lumber rejected by the inspector was such as came within the description specified in the contracts. We think the Court was right in excluding the evidence. If the inspection was not to be conclusive we are at a loss to perceive how it could have *any intelligible* effect under the contract."

So in this case the Canton Lumber Company agreed to deliver to Liller several hundred thousand feet of lumber of certain specified kinds, sizes and dimensions, and "all subject to B. & O. inspection." If the B. & O. inspection was not intended to be conclusive upon the parties to the contracts, what intelligent meaning could be given to it?

It was upon this principle of law that the Court granted the plaintiff's first prayer and rejected certain evidence offered by the defendant tending to show that the lumber measured up to certain specifications and was merchantable lumber.

2. Did the fact that the plaintiff accepted and used a part of the lumber agreed by the defendants to be furnished to the plaintiff constitute a waiver on the part of the plaintiff under the circumstances of this case to claim damages for failure on the part of the defendant to perform its obligations under the contract?

The appellant's counsel contended at the trial of the case that acceptance by Liller of *part of the lumber* and his acts of ownership over it constituted an acceptance of the whole, so that he could not refuse to accept and pay for all of it. To support their contention they cited and relied upon a line of authorities which hold, that which we concede to be the law, that acceptance and actual receipt of *part of the goods* is sufficient te prove the contract of sale within the Statute of Frauds.

There is no question here about the contract of sale. The contract is in writing as shown by the correspondence between the parties. "The effect of the acceptance and actual receipt of part of the goods, however small, is to prove the contract of sale, and it is not inconsistent with this that the vendee should have the right, with respect to the residue of the goods when offered in fulfillment of the contract, to object that they are not such in quantity and quality, as the contract requires." *Hewes* v. *Jordan*, 39 Md. 472; *Holmes* v. *Gregg*, 66 N. H. 621.

In *Holmes* v. *Gregg*, above cited, the plaintiff received from the defendant an order for five lots of lumber of different dimensions and prices, all amounting to about $1,000. "The

lumber sent by the plaintiffs came to the defendant's yard in box cars, in which it could not be examined." When unloaded and examined, three of the five lots were accepted and used by the defendants, and the others, not conforming to the order in dimensions, quality, quantity and price, were rejected and piled in their yard, where they remained subject to the plaintiff's order. The defendants seasonably informed the plaintiffs of their action, and tendered the price of the accepted lots. The Court said: "Without an express stipulation that the contract was or was not entire, the parties might have understood that it was severable in such a sense that the defendants could accept the lots that conformed to the contract and reject the rest."

The case of *Holmes* v. *Gregg*, was very similar to the one here under consideration, except that in that case the goods were subject to inspection by the *purchaser*, while in this case they were subject to inspection by a *third person* not a party to the contract. The Canton Lumber Company shipped the lumber to Liller in carload lots *subject to B. & O. inspection.* Liller unloaded the cars, and with the consent of the B. & O. officials, used some of the best of the lumber, and gave the Canton Lumber credit for it after notifying them that he had used it. The rest of the lumber he held subject to inspection, and as soon as it had been inspected and rejected, he notified the appellant.

Where goods are sold *subject to inspection*, the title remains in the vendor until inspection has been duly made, and the goods may be levied upon and sold by the vendor's creditors. *Stephens* v. *Santee*, 49 N. Y. 35; *Pullman Car Co.* v. *Metropolitan Ry. Co.*, 157 U. S. 94; *Cole* v. *Bryant*, 73 Miss. 297; *Amer. and Eng. En. of Law*, vol. 24, p. 1082.

The appellee could not have accepted the lumber if he wanted to until it had been inspected and approved by the B. & O. inspectors, and the appellant knew he could not, for it was a part of the contract (and the jury so found) that all lumber furnished by the appellant to the appellee was *subject to B. and O. inspection.*

While under the terms of the contract the lumber was to be delivered by the appellant to the appellee f. o. b. Baltimore and Ohio Railroad cars, Baltimore, the appellee was not bound to have the lumber inspected until it reached Keyser, West Va., at which place it was consigned to him. The proper place of inspection is at the place of consignment. *American and Eng. En. of Law.*, vol. 24, p. 1082; *Fogle* v. *Brubaker*, 122 Pa. St. 7.

3. Where the contract itself regulates the right of inspection and the rights and obligations of the parties in regard thereto, evidence of custom or usage of the trade is not admissible, and the Court, therefore, properly instructed the jury that there was "no legally sufficient evidence in this case of a prevailing custom affecting the rights of the parties to this suit." *Bullock* v. *Consumers' Coal Co.*, 31 Pac. Rep. 367; *Williams Mfg. Co.* v. *Standard Brass Co.*, 173 Mass. 356; *Gorman* v. *Kennedy*, 126 Mich. 182.

PEARCE, J., delivered the opinion of the Court.

This suit was brought to recover damages for an alleged breach of contract, The declaration alleges in substance that the defendant, the Canton Lumber Company of Baltimore City, agreed to sell and deliver to the plaintiff on or before July 1st, 1903, all the lumber necessary for the erection at Keyser, West Virginia, for the Baltimore and Ohio R. R. Co. of an ash pit, coal tipple and sand house, said lumber to conform to certain specifications set out in the declaration, and to be subject to B. & O. R. Co.'s inspection; the plaintiff to pay for same at the rate of $20 per thousand feet; but that the defendant did not deliver lumber conforming to said specifications, nor within the required time, and that the lumber delivered was inspected by the B. & O. R. R. Co. as provided by the contract; and was rejected as not complying with said specifications; and that because of said breach of contract the plaintiff was obliged to purchase in the open market about 466,837 feet of lumber at a price in excess of that agreed upon between the plaintiff and defendant, and to incur large addi-

tional expense on account of the delay in procuring said lumber, the whole loss to the plaintiff being the sum of $8,961.21.

The plaintiff obtained a judgment for $3,350, and the defendant has appealed. The case was tried upon the general issue plea, and there was considerable conflict in the testimony as to the specifications, and the inspection made, which resulted in the rejection of most of the lumber, and it will be necessary to summarize the more important parts of the evidence, before going into the law of the case.

The plaintiff and defendant had previous business relations, and there had been some correspondence between them in anticipation of the awarding of the contract for the erection of this coal tipple and sand house to the plaintiff by the B. & O. R. R. Co. In order to aid the plaintiff in securing this contract, the defendant named the price $20 per thousand at which it would be willing to furnish the necessary lumber, if the contract should be given to him, and he should determine to purchase the lumber from the defendant.

On March 28th, 1903, the plaintiff wrote the defendant that the contract had been awarded to him, and that he would furnish defendant as soon as possible with list of sizes of material "which you are to furnish me at $20 per M. ft. all around, f. o. b. B. & O. cars your city." He had previously on March 24th, sent defendant an approximate list of the sizes of material, stating that as soon as the contract was actually awarded and signed he would furnish corrected list. On March 31st, he wrote defendants, enclosing corrected list of number of pieces, sizes, dimensions, and kind of lumber to be furnished. The testimony of the plaintiff himself, and of Mrs. Ayer, his stenographer who wrote the letter of March 31st, was that upon the margin of this list there was written by the plaintiff in blue pencil, "All stock to be Ga. Y. P. or heart white oak, except what is marked N. C. Y. P. and all subject to B. & O. inspection."

On April 2nd defendant acknowledged receipt of revised list of material, and returned  n order that all items of N.

C. pine might be designated.    On April 3rd plaintiff again
returned the list marked as requested, and on April 4th
defendant acknowledged receipt of same.    These letters con-
stitute the formal contract between the parties, together with
the corrected list of material.    The plaintiff himself testified
that he made the blue pencil memorandum, "all subject to.
B. & O. inspection," on the corrected list of material before
sending it to defendant on March 31st, but that memorandum
was not on the approximate list sent defendant March 23rd,
and that the original offer of $20 per M. was made on the
approximate list.    Mrs. Ayer, plaintiff's stenographer, testi-
fied that she typewrote the letter of March 31st and the cor-
rected list enclosed and that she saw Liller write the blue pen-
cil memorandum on that list at that time; that she saw this
list when defendant returned it for notation of N. C. pine, and
that the blue pencil memorandum was then on it, just as
originally written.    Mr. Virdin, secretary of defendant, testi-
fied that he conducted the correspondence of the company;
that in the preliminary negotiations leading up to this contract
Liller told him the lumber was for a coal tipple for the B. &
O. R. R. Co. and that he went over the estimated list with
Liller, and was quite sure Liller understood that as high
a grade of timber as they had been furnishing him, which was
merchantable timber, was not required and therefore he could
furnish it at $20 per M.    He testified that when he received
the corrected list of material in the letter of March 31st there
was no blue pencil memorandum thereon, nor any reference to
B. & O. inspection, and that he furnished the lumber in pur-
suance of plaintiff's letter of April 3rd already referred to.
On cross-examination he said this corrected list was not
returned to him with letter of April 3rd, but only a carbon
copy on which there was a marginal note as follows: "All
stock to be G. Y. P. or heart white oak, except what is
marked N. C. Y. P. all subject to B. & O. inspection," but
that he understood that was merely a matter between the
plaintiff and the B. & O. R. R. under their contract with him,
and therefore made no difference to defendant.

.. Mrs. Hamill, the defendant's book-keeper and stenographer, testified that she copied the corrected list on April 2nd, before it was returned to plaintiff for notation of N. C. pine, and that there was then no blue pencil memorandum thereon.

· The contract between the plaintiff and the R. R. Co. was not actually signed until April 22nd though awarded March 28th.   On March 23rd defendant wrote plaintiff, saying they understood "nothing was binding until papers are signed," but asking for memorandum of sizes, &c., "so that we can do some figuring."   It was obviously in reply to this that the approximate list of March 24th was sent.

The lumber was shipped to the plaintiff at Keyser where it was unloaded from the cars, was inspected by the B. & O. inspectors, and the greater part was condemned as not coming up to the specifications.   The plaintiff cut up and used in the construction of the tipple, a portion of the lumber which passed inspection, and the defendant subsequently removed the rejected lumber, and the plaintiff purchased other lumber elsewhere to enable him to fulfill his contract with the B. & O. R. R. Co.   The plaintiff notified defendant on July 31st, 1903, that Mr. James, one of the B. & O. inspectors, thought he would be obliged to condemn the lumber as not up to the specifications, and plaintiff in that letter said it was probable the B. & O. people would send an inspector from Baltimore to go over the whole lot, and advised defendant to have a representative on the ground also.   There does not appear to have been any reply to that letter, but there are subsequent letters between the parties relating to that subject, in which the defendant apparently acquieces in the right of inspection bp the B. & O. R. Co.   Thus on August 3rd plaintiff wrote defendant that he put in a whole forenoon with Mr. James, and that the outlook was better than at first appeared, but that the lumber then thrown out was nearly all saps or contained large unsound knots; that Mr. James was going to Baltimore that evening with samples he had sawed off, and that plaintiff was afraid there would be further trouble; that he was doing all he could for defendant in the matter and try²

ing for the sake of "Auld Lang Syne" to get them out of the matter as whole as possible. On August 4th defendant acknowledged plaintiff's letter of the 3rd with thanks, and expressed the hope "that you will come out as well as you anticipate, saying "we can do nothing but await results." On August 7th defendant acknowledged receipt of two letters of 3rd and 6th inst. (which are not in the record) and expressed regret that the B. & O. people want to open the timber question again, and say "if they decide to put an inspector on this lumber, we think it would be better to have him come here and inspect what is on the steamer now as we load it on cars, so there will be no come back on that." On August 8th plaintiff replied that he thought it would be best to hold up a day or two longer until the inspector reached Keyser and they could find out what he was going to do about lumber already there.    In none of these letters, and in none of the correspondence prior to defendant's letter of September 10th, is there any denial of the right of inspection by the B. & O. people, or any intimation of any dissent therefrom.    Plaintiff had written defendant on September 9th notifying it of the final rejection of the lumber and that he should hold them liable for loss involved, to which they replied saying that the lumber came fully up to specifications, and declining to recognize any liability to plaintiff.    Mr. Virdin testified that he knew this lumber was for a tipple and sand house for the B. & O. R. R. Co. and that he knew whatever the plaintiff put in for B. & O. work was subject to its inspection, but that he furnished the kind and grade of lumber agreed upon between him and the plaintiff; he admitted that on August 10th he replied to plaintiff's letter of the 8th inst., and said, "We think, as you, that it is best not to stir up the B. & O. people about an inspector, and if they decide to forget it; they will have our everlasting blessing." He explained that in writing that letter, he was interested in Mr. Liller as a good customer, and did not want the lumber turned down, because he would have to compel plaintiff to pay for it.

The blue print specifications governing the contract between

plaintiff and defendant were as follows: "Lumber to be of good quality, free of large, unsound, or loose knots also free of sap or other defects which will materially affect its strength. It must be sawed to true dimensions and straight."

The contract of plaintiff with the B. & O. R. R. Co. provides: "All timber must be sound and free from sap, loose or rotten knots, wind shakes, or any other defects, which would impair its strength and durability, and shall be acceptable to the engineer: it must be in addition to the above straight grained and sawed perfectly straight and to the exact dimensions, with full corners and square edges." Thus it will be seen that the latter specifications are some what more rigid than the former, though the difference is not very great.

The two principal grounds of defense set up, are, first that there was no requirement for inspection by the B. & O. R. R. Co. and second that even if there were this requirement, the inspection made was under the specifications of the plaintiff's contract with the B. & O. and not under the specifications of the contract between the parties to this suit. The testimony upon the first of these defenses has already been referred to, and that upon the second will now be briefly stated.

· The plaintiff testified that the B. & O. R. Co. inspectors had no right to inspect on any other scale than that of the blue print specifications but that in fact the lumber was condemned under the blue print specifications alone and that he had repeatedly told Mr. Virdin that the lumber was subject to B. & O. imspection. Four witnesses testified for the plaintiff as to how the inspection was made. Mr. Jones, a civil engineer, testified that in the spring and summer of 1903 he was in charge of the construction of the new plant of the B. & O. R. R. Co. at Keyser, that he knew Mr. Virdin as the representative of the Canton Lumber Company, and that in a conversation with him in reference to this lumber, Mr. Virdin admitted he knew it was to be subject to B. & O. inspection, and that it was inspected under the blue print specifications; that he himself had originally had supervision, and when he found so much of the lumber unfit, he took the matter up with Bal-

timore and they sent up some of their regular inspectors, among them a Mr. Stottlemeyer; and that the lumber did not measure up to the blue print specifications; that is 80 or 90 per cent did not; that it was sappy, had a great many large knots, and some was badly wind shaken; some was soft and doty—it was inferior lumber; that knowing the lumber was defective, he hesitated to condemn it because of the delay this would cause in getting the plant in operation, and turned the inspection over to the lumber inspector; that when the inspector came he gave him the blue print and told him to go ahead.

Mr. Stottlemeyer testified that he had no instructions; that Mr. James gave him the blue print specifications and that he went ahead according to these *and to his own judgment as to what the lumber was to be used for;* that he inspected all the lumber under the blue print specifications offered in evidence and that none of the lumber he rejected, measured up to these specifications. On cross-examination, he testified that he did not let the blue print govern his judgment *entirely* and that he inspected the lumber in accordance with what is *merchantable lumber.*

On redirect examination he testified he inspected the lumber "on his judgment as it applied to the specifications on the blue print, and that the lumber rejected did not measure up to these specifications, and that if it had measured up to them he would not have rejected it."

Mr. Andrews testified that in the summer of 1903 he was assistant engineer of bridges for the B. & O. R. R. Co., that he knew Mr. Virdin and talked with him in December, 1902, about some lumber the Canton Lumber Co. was proposing to furnish the B. & O. for round houses at Keyser, and that he then told Mr. Virdin all lumber purchased by contractors for B. & O. work, was subject to B. & O. inspection; that after the inspection of the lumber now in question by Mr. Stottlemeyer, that the witness and Mr. Clay made a final examination; that he had seen the blue print specifications, and that the lumber did not come up to their requirements, and

that was the reason he rejected it.   On cross-examination he testified that he turned the lumber down both for the reason that it did not conform to the blue print specifications, and also *that it was unfit for the purpose for which it was to be used;* that Mr. Kinsman, engineer of construction, directed that the inspection should be made under the contract of Liller with the railroad company, but that it was in fact made not on the wording of that contract, but on the wording of the blue print, and that he and his associates "only took into consideration the specifications as written on the blue prints."

Mr. Kinsman testified that after receiving the report of Mr. Stottlemeyer, Mr. James and Mr. Clay, he himself saw the lumber, that there were two specifications, the blue print, and those in Liller's contract with the R. R. Co. that he could not state under which of these the inspection was made, but that in his judgment the lumber did not measure up to the blue print specifications; that he directed Mr. Alexander to have it inspected both under the contract of the R. R. Co., and under the blue print specifications, and that if inspected under either it would have been condemned.

Mr. Virdin testified for defendant that there is a recognized custom in the lumber trade that upon inspection the buyer must accept all or reject all, unless the seller consents to acceptance of part and rejection of part, and Messrs. Edward P. Gill, Wm. M. Burgan and Louis Dill, all experienced lumber dealers, testified to the same effect.

Mr. Berryman, general manager of the defendant, testified that he was familiar with the grading of lumber and was at one time inspector for the Tunis Lumber Co.; that he saw this lumber when it was discharged from the steamer and loaded on cars and that it compared favorably to the grade required by the blue print specifications; that Mr. James told him the lumber was unfit for the work required, and that he was condemning it "not under the blue print specifications, but under other specifications, and also as to what it had to be used for."   He further testified that there was a great difference between the specifications under which Mr. James

was inspecting and those under which plaintiff had ordered the lumber, the former being much more exacting in its requirements.

John H. Younger and William A. Barnes, sworn inspectors of the Baltimore Lumber Exchange, testified that they were furnished with the blue print specifications in evidence. Mr. Younger testified that he made the inspection under these specifications, but as will hereafter appear was not allowed to state whether the lumber was such as was called for by the specifications.

Mr. Barnes testified that he only inspected the lumber on the Schooner Arragon and that he did not know whether that was used by Mr. Liller or not, but that all he inspected would come up to the specifications.

During the delivery of this testimony six exceptions were taken by the defendant to the rulings of the Court, and the seventh exception was taken to the ruling on the prayers. While the plaintiff was on the stand, after stating that his last dealing with the defendant had reference to the purchase of lumber for the coal tipple and sand house of the B. & O. R. R. at Keyser in 1903, he was asked this question, "Had the Balto. & Ohio Rail Road Co., or not entered into an agreement with you whereby you were to furnish all the lumber, and do all the work toward the erection of this building?"

The defendant objected to this question and the objection being overruled, the first exception was taken. To sustain this exception the defendant relies upon *Baker* v. *Gunther*, 53 Md. 374. In that case the issue was whether work was done and materials furnished by the plaintiff to defendants under a contract *between them* for the construction of an embankment for defendants, who occupied a pier on ground belonging to the Canton Co. The defendants offered in evidence a lease between them and the Canton Co. *made after the embankment was begun,* for the purpose of showing that it was the company's duty to construct the embankment, and the lease was held inadmissible. That was obviously correct, because even if as between Baker and the Canton Co. the company was

bound to erect the embankment, that would be no defense to a contract between Baker and Gunther, by which Baker assumed a liability to Gunther. Nor do we perceive anything in *B. & O. R. R. v. Stewart,* 79 Md. 487, to aid this exception. Here the fact of the contract alone was proposed to be shown without invoking any of its terms as affecting the contract in suit or the right of recovery thereon. The fact of the existence of such a contract was relevant and material upon the question of the right of the plaintiff, upon a breach of his contract with the defendant to go into the market to procure lumber necessary to enable him to fulfill his contract for the erection of the coal tipple and sand house.

Mr. Virdin being on the stand for defendant, after testifying that he had had numerous other contracts with Mr. Liller to furnish lumber for work for the B. & O. R. R. was asked, "Did you not know, and had you not been so informed that all those contracts for lumber must be subject to B. & O. inspection?" An objection to this question was overruled and the second exception was to this ruling. There was testimony tending to show that before this time Mr. Virdin was informed that all lumber furnished by contractors for B. & O. work was subject to B. & O. inspection, and Mr. Virdin himself subsequently testified that "he had a general understanding that the B. & O. inspected everything that went into their construction." This question therefore did not present the case of merely one contract as compared with one other, both isolated, but rather a question of the uniform custom of the B. & O. R. Co. in reference to such contracts, and we do not think there was any error in this ruling.

Mr. Edward P. Gill, a witness for defendant, after testifying to a custom as to the right to reject part or all of a cargo or carload of lumber not up to specifications, was asked this question, "Did your firm furnish some of the lumber used in this coal tipple to be erected by Mr. Liller?" This question was excluded and the third exception was taken to this ruling. The purpose of this question evidently was to show that the lumber furnished by witness' firm was of a better grade than that

required by the blue print specifications.   But that was not the question for consideration.   The only question was whether the lumber delivered by the defendant satisfied that contract.   If it did not, then the fact that the plaintiff accepted from Mr. Gill's firm lumber which was superior to that which they rejected when offered by defendants would not tend to show whether defendants' lumber was up to the specifications or not.   We can discover no error in this ruling.

The fourth exception was abandoned apparently, not having been adverted to either in the brief or in the oral argument of the appellant, but the question was free from error; since it merely asked if the alleged custom would apply if there was a previous agreement for the use of part of the lumber and the return of the rest, and it is obvious that a special agreement would supersede a general custom.

Theodore Mottu, an expert in the lumber trade, called to corroborate Mr. Gill as to the alleged custom was asked this question.   "Look at the specifications set out on this blue print and tell the jury whether these specifications would meet the grade of what is termed merchantable lumber under the rules of 1883?"   The plaintiff objected to this question and the objection was sustained and the fifth exception was taken to that ruling.

The argument of the appellant upon this exception is made upon the assumption that the only inspection made was upon the standard of merchantable lumber under the rules of 1883, and that these rules would require a higher grade than that required by the blue print specifications.   But neither of these assumptions is sustained by the evidence.   There is no attempt in the evidence to define the standard of merchantable lumber under the rules of 1883.   Moreover it has been shown already from the testimony of Stottlemeyer that while this lumber was not merchantable in his judgment it failed to measure up to the blue print specifications, and that if it had done so, it would not have been rejected.   It has also been shown from the testimony of Andrews that while Kinsman's instructions were to inspect under the contract between Liller and

the Railroad Co. that he disregarded those instructions, but inspected under the blue print specifications alone, and that the lumber was rejected solely because it did not meet their requirements.    It has also been shown from the testimony of Kinsman that while he directed the inspection to be made both under the contract between Liller and the R. R. Co. and the blue print specifications, that he examined this lumber and that it would not conform to either test.    It is thus apparent that the blue print specifications called for merchantable lumber under the rules of 1883, and unless merchantable lumber under those rules was shown to be a higher grade than that called for by the blue print specifications, any technical error in excluding this question cannot be regarded as reversible error.

The sixth exception was not noticed in the argument or brief of the appellant.    It is not clear what the offer was, but if we assume that it was to show by Mr. Younger that the lumber came up to the blue print requirements, we think the ruling was correct, since the admission of such testimony would be to substitute his inspection, for that required by the contract, which, in the absence of fraud or bad faith is conclusive.

This brings us to the prayers, those of the plaintiff being all granted, and those of the defendant all refused.

The chief points of contention on the law are, 1st, Whether the contract was entire or separable; and 2nd, even if separable, whether under the evidence of custom offered by the defendant, the acceptance of part of the lumber was in law an acceptance of the whole.

The defendant did not discuss any of the plaintiff's prayers, and we do not understand it to question the legal proposition submitted in the plaintiff's first prayer, that if the contract provided for inspection of this lumber by the B. & O. R. R. Co. and such inspection was made in good faith in the manner agreed on, that it was conclusive as to the quality of the lumber.    It could not be seriously questioned as the law of Maryland since the decision in *Lynn* v. *B. & O. R. R. Co.*,

60 Md. 414, and *B. & O.* v. *Brydon*, 65 Md. 220–221, and it follows that the plaintiff's first prayer was properly granted. We can discover no evidence in the record to show fraud or bad faith on the part of the B. & O. inspectors in making the inspection and there was no error in granting the plaintiff's fifth prayer to that effect.

The plaintiff's second and fourth prayers may be considered together. The second prayer, after requiring the jury to find the sale of the lumber, the contract for inspection, the inspection made in accordance with the contract, and the rejection of a large part of the lumber because it did not measure up to the specifications, asserts in substance that if in consequence of such facts, the plaintiff was obliged to purchase other lumber to take the place of that which was rejected, and was delayed in the execution of the contract with the R. R. Co. then he was entitled to recover the difference between the contract price for such lumber and that which he was required to pay in open market together with such damages as the jury should find necessarily incident to the delay in completing the work.

The fourth prayer instructed the jury, that the use of a part of the lumber furnished by the defendant did not preclude the plaintiff from the recovery of damages for defendant's failure to perform its obligations under the contract. The defendant's first and second prayers, both involve the question of the entirety of the contract and present in substance the converse of the legal principles asserted in the plaintiff's second and fourth prayers.

In *Brewster* v. *Frazier*, 32 Md. 308, JUDGE ROBINSON said: "The question, whether a contract is *entire* or *separable*, is sometimes one of difficulty, and no precise rule can be laid down to embrace every case. Like most other questions of construction, it depends upon the intention of the parties, and this must be discovered in each case by considering the language employed and the subject matter of the contract. 2 *Parsons on Contracts*, 677." In *Md. Fertilizing Co.* v. *Lorentz*, 44 Md. 234, the Court quoted with approval the lan-

guage used in *Watchman* v. *Crook*, 5 G. & J. 254, where it was said: "The strong leaning of the Courts in modern times has been to disencumber themselves from the fetters of technical rules, and to give such a rational interpretation to the contract, as will carry the intention of the parties into full and complete operation."

Putting ourselves as far as may be into the situation of the parties when this contract was entered into, we see that the business of the defendant was the purchase of lumber for sale to others, while that of the plaintiff was contracting for the building of the various structures into which lumber so largely enters.

The plaintiff did not agree to purchase this lumber for sale to others. He had no business place for its storage or deposit, no customers resorting to him to buy, and no salesmen skilled to secure such customers. He contracted for this lumber to be put by him into the tipple and sand house which he had come under a legal obligation to erect for the B. & O. R. R. within a prescribed time, and out of material suitable for those particular structures. It was to be used at a distant point—most of it in a structure requiring from its nature, extraordinary capacity for carrying weight, and corresponding strength and durability. He could not put into these structures such lumber as he might choose, but only such as should pass the inspection stipulated for in the specifications accompanying his order for this lumber, and every fact thus recited was known to the defendant as fully as to the plaintiff. Unless it measured up to the specifications, it was of no practical value to the plaintiff for the only purpose for which it was ordered, and not being a dealer equipped for re-sale, it was of little value to him for any purpose. He was compelled, in order to perform his contract with the Railroad Company to purchase without delay other lumber to replace such as should be rejected under proper inspection. Can it be supposed then that it was the intention of either of the parties, that if one-half or one-quarter of the lumber passed the inspection, and the remainder was rejected, that the plaintiff could not use

the former for the specific purpose for which it was bought, without being required to take also the rejected portion which he could not use? Such a conclusion is as irrational when attributed to the defendant as when attributed to the plaintiff under all the circumstances of this case. And this construction is supported by the subsequent dealing of the parties with respect to the rejected lumber, which was accepted and removed from Keyser by the defendant. It is true that this alone would not be conclusive, and it would have comparatively little significance if accompanied by a declaration that the acceptance of the rejected lumber was only for the purpose of reducing thereby the damage sustained, but when unexplained as in this case, the conduct is most significant of the intention of the parties. As illustrative of this view, it was said in *Richards* v. *Shaw*, 67 Ill. 222, that the modern rule is that the entirety of a contract of sale is severed by the buyers receiving and retaining a part after the seller has refused or failed to deliver the residue of the specific quantity of goods bargained for.

The case of *Holmes* v. *Gregg*, 66 N. H. 621, relied on by the plaintiff is directly in point, and meets with our full concurrence. That was a sale of lumber shipped on cars in five lots—three of which were accepted and used by the defendants, and the others not conforming to the order in quality, were rejected and piled in their yard where they remained subject to the plaintiff's order. The defendants seasonably informed the plaintiffs of their action and tendered the price of the accepted lumber, and the Court said, "Without an express stipulation that the contract was or was not entire, the parties might have understood that is was severable in such a sense that the defendants could accept the lumber that conformed to the contract and reject the rest."

This view was held by this Court in *McCeney* v. *Duvall*, 21 Md. 185. In that case McCeney purchased of Duvall for $3,450 three slaves under a warranty of their soundness. One of these proved to be unsound, and it was held that it was not necessary for the purchaser to return, or offer to re-

turn, all of them on discovering the unsoundness of one of them.

We have examined the Massachusetts and Iowa cases, and the cases cited by the appellant from the Federal Reporters upon the entirety of contracts, but the facts of those cases differ so materially, except in the Iowa case, from the case now before us that we do not think it necessary to discuss them. The Iowa case is offset by the New Hampshire case and we prefer to follow the latter. It follows that the plaintiff's second and fourth prayers were properly granted and the defendant's first and second prayers were properly rejected.

. The plaintiff's sixth prayer asked that the jury be instructed there was no legally sufficient evidence in the case to show any prevailing custom affecting the rights of the parties, and the defendant's fourth prayer was based upon the theory that there was evidence of a custom the effect of which was to disentitle the plaintiff to recover.

In *Gibney* v. *Curtis*, 61 Md. 201, this Court said, speaking of *usage*, "It is never admissible where it is inconsistent with the terms of the contract, *or the apparent intention of the parties*." We have already said why we find that the clear intention of the parties was that it should be separable and no evidence of a custom or usage could render *entire* a contract which the parties intended to make separable, whether that intention is expressed in words or by clear implication from the circumstances and subject matter of the contract. The plaintiff's sixth prayer was therefore properly granted, and the defendant's fourth prayer was properly refused.

The plaintiff's seventh prayer on the measure of damages laid down the correct rule where the plaintiff in such a case is entitled to recover.

The defendant's third prayer asks an instruction that if the lumber was inspected under a higher standard of quality than that by which it was sold, or if the inspectors inspected it from their own ideas of its fitness for the purposes for which it was to be used, and did not inspect it by the specifications by which it was sold, then the inspection was not in accordance

with the contract of sale, and their verdict must be for the defendant.

This proposition is so manifestly legally correct that we must suppose the learned Court considered the evidence insufficient to support the prayer, and therefore refused it, and we have carefully considered this view of the matter.

But the plaintiff's own witnesses, whose testimony on that point we have already reviewed all made admissions which standing alone and unexplained clearly tend to show that in making the inspection they did not confine themselves to the blue print specifications, which is the sole standard under the contract.  It is true that at some point in their testimony, they all swore positively, in substance that the lumber did not measure up to the blue print specifications and was rejected for that reason alone, but Stottlemeyer who made the fullest inspection said as his last words "that the only part the blue print played in his examination was, to indicate to his mind for what purpose the lumber was to be used."

But when witnesses are not consistent with themselves, the whole of their testimony should go to the jury under proper instructions, for the judgment of the jury upon the contradictory or variant statements of the same witness.  We are not able to say that these variances are so light and inconclusive that no rational mind could draw the conclusion allowed under the prayer and believing this we are constrained to reverse the judgment that the jury may pass upon the weight of the testimony upon that question.

> *Judgment reversed with costs to the appellant above and below, and cause remanded for a new trial.*