GRATIOT STREET WAREHOUSE COMPANY, Respondent, v. D. W. WILKINSON et al., Appellants.

St. Louis Court of Appeals, May 13, 1902.

1. **Evidence: CONTRACT.** In the case at bar, the evidence is examined and it is held that there was a contract for the sale of corn to defendants, quality to be determined by St. Louis inspection.

2. **Contract: CONSTRUCTION OF.** Where corn is purchased as of a certain grade and quality, according to official inspection, at the place of shipment, such inspection in the absence of anything to impeach it as dishonest or collusive, is conclusive as to the grade and quality shipped to the purchaser.

3. ———: ———. Where the correspondence between plaintiff and defendant showed a contract for the purchase by defendant of corn of a certain grade and quality, according to official inspection at the place of shipment, the fact that after defendant had refused to

receive a part of the corn until he was allowed to inspect it, plaintiff allowed the inspection, and that plaintiff had, under protest, previously allowed defendant rebates on corn, expressly stating, however, that he would allow no more, was not sufficient to overcome the effect of the correspondence so as to make the contract one of sale subject to defendant's inspection, instead of the official inspection, especially in view of evidence showing that defendant was allowed to inspect merely as an inducement to settle.

4. ———: TITLE: INSPECTION. In an action against a grain dealer for breach of contract in refusing to receive corn purchased by him of a certain grade, according to official inspection at the place of shipment, the question as to when the title passed is immaterial, defendant being obliged to receive it, regardless of its condition when it reached him, if the official inspection showed that it was of the grade ordered when placed on the cars.

Appeal from St. Louis City Circuit Court.—*Hon. Jacob Klein,* Judge.

AFFIRMED.

STATEMENT OF THE CASE.

This suit was commenced before a justice of the peace in the city of St. Louis on the following petition, omitting caption:

"Plaintiff for cause of action states that on two contracts for 6,000 bushels of corn, it sold to defendants and defendants bought from plaintiff upon the terms and conditions hereinafter stated, 105,625 pounds or 1,886 8-50 bushels of corn at 38c per bushel aggregating the sum of $716.40, of which 35,207 pounds or 628 32-56 bushels were shipped upon the seventh day of May, 1897, and 35,207 pounds or 628 32-56 bushels were shipped on the eighth day of May, 1897, and 35,210 pounds or 625 35-56 bushels more shipped on the eighth day of May, 1897, all of which was to be put f. o. b. cars at the city of St. Louis, Missouri, St. Louis weights and inspection, thence to be forwarded, shipper's order, to defend-

ants at Jackson, Mississippi. That plaintiff duly performed its part of said sale and purchase, but that upon arrival of each of said lots of corn at Jackson, Mississippi, the defendants refused to accept or pay for same or any part thereof, to plaintiff's damage in the sum of $425.82.

"Wherefore plaintiff prays judgment against the defendants for the sum of $425.82, with its costs of suit."

To the statement defendants filed an answer and counterclaim in three counts alleging two purchases of corn from the plaintiff and praying damages for plaintiff's alleged failure to deliver the corn purchased. The answer and counterclaim were dismissed in the justice's court and not relied on in the circuit court, to which the defendants appealed.

On trial in the circuit court, by the court without a jury, plaintiff again recovered judgment, from which defendants duly appealed to this court.

The evidence discloses that appellants are wholesale grocers doing business in the city of Jackson, Mississippi, and dealers, also, in grain, by wholesale; that prior to the transactions out of which this suit arose, they had on divers occasions purchased corn by the carload from the respondent; that on one or more occasions the customers of appellants had made demands on them for reclamations on account of corn purchased of them being unsound; that appellants had made good such losses to their customers and in turn had been compensated for the payments by the respondent.

On April 19, 1897, respondent, presumably in answer to a letter from the appellants asking reclamation on account of one of such losses, wrote the following letter:

"St. Louis, Mo., April 19, 1897.

"D. W. Wilkinson & Co.,
        "Jackson, Miss.

"Dear Sirs: Your long letter of the 14th received. While we know it is not a just claim, especially on car of 2

corn, we have concluded to pay it rather than have any un-pleasant differences with you about the matter, but we wish to say now that we will never pay any more such claims. We will ship you the grade of corn you order and use our best judgment to get you good corn, but you must take your own chances; we can not do it for the little profit we get out of it.

"Yours truly,

"F. W. SMITH."

Again on April 26, 1897 respondent wrote the appellants the following letter:

"St. Louis, Mo., April 26, 1897.
"D. W. Wilkinson & Co.,
      "Jackson, Miss.

"Dear Sirs: Your letter of the 24th received asking us to wire on Monday prices of strictly dry sound mixed white corn. As we had quoted you price by mail Saturday even-ing and there was no change in price, did not wire you to-day. However, we can not quote you strictly dry 2 white corn or 2 corn, as you know there is none of it that is strictly dry, and can only quote you by St. Louis inspection. We will do the best we can to give you dry corn, but we do not guarantee it.

"Quote you again this evening by night message.

"Yours truly,

"GRATIOT STREET WAREHOUSE Co.    S."

On April 29, respondent wired appellants as follows:

"St. Louis, April 29, 1897.
"D. W. Wilkinson & Co.,
      "Jackson, Miss.

"Two mixed corn 38 white 41 1-2 same terms. Three white oats 29 1-2. Handle car oats don't sell less than 28.

"GRATIOT ST. W. H. Co."

Gratiot Street Warehouse Co. v. Wilkinson.

On the same day appellants wired respondent as follows:

"Jackson, Miss., April 29, 1897.
"Gratiot Street Warehouse Co.,
          "St. Louis, Mo.
"Ship 3,000 bushels sacked two mixed corn sound and dry. Have agent here turn car of oats over to us.
                         ."D. W. WILKINSON & Co."

On April 30, respondent wrote appellants as follows:

"St. Louis, April 30, 1897.
"D. W. Wilkinson & Co.,
          "Jackson, Miss.
"We have your telegram saying ship 3,000 bu. dry mixed corn, and have agent wire to have car of oats turned over to you. We have had agent wired to do this. We accepted your order for 3,000 bu. 2 mixed corn on same terms as we have been selling you and we will give you as dry corn as we possibly can. Please understand that we do not guarantee it to be dry or do we guarantee you against loss. Ship you 2 corn and send you certificate of inspection with each car.
                         "Yours truly,
                    "GRATIOT ST. W. H. Co.    S."

On May 1, but before the reception of respondent's letter of April 30, as appellants say, they wired as follows:

"Jackson Depot, Miss., May 1.
"Gratiot Street W. H. Co., St. Louis, Mo.
          "Rush corn and oats here. Entirely out. Wire price.
                    "D. W. WILKINSON & Co., 9:14 A. M."

On the same day respondent by wire to appellants quoted "2 mixed corn at 38 cents, 2 white at 41 3-4." There is no

answer in the record to this telegram by wire or letter, but respondent's evidence tends to prove a telegram was received from appellants of the same date and on which respondent booked 3,000 bushels No. 2 mixed corn at 38 cents as sold to appellants. The respondent shipped 3,000 bushels of corn on the order of April 29. The shipments were consigned to the order of respondent; to each of the freight bills it attached a draft drawn on appellants; the bills were indorsed by respondent and deposited in bank at St. Louis with instruction to forward to bank at Jackson, appellants to be notified. When the first car arrived, the appellants paid the draft drawn on them for the price of the corn, received the freight bill and took possession of the corn without first inspecting or having the privilege of inspecting it; the condition of the corn was unsatisfactory, of which they notified respondent and refused to receive or pay for any more of the shipments unless they were first allowed to inspect the corn in the cars. The respondent agreed to allow the inspection and so instructed the railroad freight agent at Jackson. As the other shipments arrived, the appellants inspected the corn and received and paid for all that was merchantable, but refused to receive the three carloads, for the loss of which the suit is brought.

The evidence tends to show the rejected corn when it arrived at Jackson was wet, mouldy and some of it rotten. After appellants refused to receive this corn, respondent, by its agent in Jackson, made sale of the corn on the best terms possible and sustained a loss of $425.82. The evidence is clear that two of the rejected cars were inspected at St. Louis by a state grain inspector, who gave a certificate that the corn was No. 2 mixed and there is also evidence tending to prove that the third one was likewise inspected by the same officer and he testified that the corn he inspected was No. 2 mixed and that corn which was graded as No. 2 on an inspection in the St. Louis market was sound and dry.

In addition to the evidence of the inspector, the evidence

of respondent's employee who sacked the corn, an experienced man in handling and inspecting grain—was that the corn was sound and dry and reasonably clean when loaded into the cars. On the part of respondent, the evidence also tended to show that at the season of the year when the corn was shipped, corn is inclined to germinate, especially when in bulk and to become damp in a very few days, that the crop of corn for the year 1897 was generally imperfect and that it was very difficult to keep it dry and in good condition, after the germinating season.

On the part of appellants, the evidence tended to prove that No. 2 corn if dry would keep dry and sound for an indefinite time, that the cars in which the rejected corn was shipped were in good condition, and that corn could not have been made wet or damp from leakage in the cars.

In respect to the place of sale, Mr. Smith, the president of respondent testified as follows:

"The facts were that between us and our customers when we sell them, they understand as well as we do that we do not sell the corn delivered, but that the price quoted is cost and freight. Every dealer understands that term, and he knows that the corn is sold him to cost him that much money including the price that corn costs in St. Louis and the freight added. It is a regular understanding between the shippers and the parties that buy. And we don't quote it as delivered, we quote it cost and freight, but we do not understand that we are selling it delivered. After we put it aboard the cars in East St. Louis, in good condition, and the inspection certificate and everything attached as we did in this case, and under the terms which we sold, we considered that our liability is at an end, and we told Mr. Wilkinson so in plain terms at the time the same was made."

Other facts may need to be mentioned in the opinion.

The court on its own motion gave the following declaration of law:

"The court declares as a matter of law, the effect of the letters and telegrams offered and read in evidence, relating to the sale of the corn in question, to be that said corn was sold by plaintiff to the defendants as No. 2 mixed corn, St. Louis inspection."

*R. P. & C. B. Williams* for appellants.

(1) Before an offer to purchase or sell becomes completed and binding upon both parties, there must be an unequivocal, unconditional acceptance without any variance between it and the offer. Strange v. Crowley, 91 Mo. 289; Taylor v. Von Schraeder, 107 Mo. 206; Sawyer v. Brossat, 67 Iowa 678; Gilbert v. Baxter, 71 Iowa 327; Lancaster v. Elliott, 28 Mo. App. 86; Egger v. Nesbit, 122 Mo. 677. (2) The evidence in this case relied upon to establish a contract between plaintiff and defendants, consists wholly of telegrams and letters. This would make it a question of law to be determined by the court. James & Son v. Fruit Jar & Bottle Co., 69 Mo. App. 207; Potts v. Whitehead, 20 N. J. Eq. 55; Mfg. Co. v. Broderick, 12 Mo. App. 378. (3) The proposals to sell on St. Louis inspection, was not accepted, the offer of defendants was for "sound and dry corn;" this varied the proposal. The letter from the plaintiff modified and changed the transaction in every particular. And the parties were left as if no offer at all had been made. James & Sons v. Fruit Jar Co., 69 Mo. App. 210; Railway v. Rolling Mill Co., 119 U. S. 149; Bruner v. Wheaton, 46 Mo. 363; Robinson v. Railroad, 75 Mo. 497; Kemie v. Byrne, 27 N. Y. Sup. 143. (4) If the transaction between the parties did not make a complete contract, it is immaterial how either of the parties to the transaction regarded the matter. Jessen v. Mount Hope Iron Co., 53 Maine 23. (5) When the defendants ordered No. 2 mixed sound and dry corn, and the plaintiff accepted such offer with the condition that the corn

would be as dry as they could get, this was such a modification in the law, as would amount to a rejection of the offer, and would become, in its modified form, a new proposal which would require acceptance in order to constitute a contract between the parties.    Shickle v. Choutcau, 10 Mo. App. 241; Wire Company v. Broderick, 12 Mo. App. 378; Statesburg v. Massengale, 13 Mo. App. 221; Randolph v. Frick, 57 Mo. App. 400; Robertson v. Folley, 48 Mo. App. 239.

*Frank K. Ryan* for respondent.

(1) The letters and telegrams between the parties show conclusively that they understood specifically that they were contracting in regard to No. 2 mixed corn, Saint Louis inspection, and the proper officer having in good faith inspected and found that the corn shipped was all of that kind, his certificates are final, and completed the contract and made it binding on both parties; as it was competent to agree that the inspection should be in St. Louis and for them to complete the contract before the arrival of the corn in Jackson.    Nofsinger v. Ring, 71 Mo. 149; Dinsmore v. Livingston, 60 Mo. 244; Williams v. Railroad, 112 Mo. 463; Chapman v. Railway, 114 Mo. 542; Benjamin on Sales, sec. 157; Cusack v. Robinson, 1 B. & L. 299.    (2) By the inspection and by the defendants taking and paying for one or more cars of each lot of corn, they accepted the same, and the three cars in question were certainly at the risk of the defendants after the inspection, and it seems that the title to same then passed to the defendants, subject to the lien thereon for the purchase money.    Morse v. Sherman, 106 Mass. 430; Hamilton v. Clark, 25 Mo. App. 428; Bass v. Walsh, 39 Mo. 192; Beardsley v. Beardsley, 138 U. S. 266; Brown v. Ford, 54 Hun 116, affirmed in Brown v. Ford, 126 N. Y. 643, without opinion; Inglish v. Stock, 10 App. Cases 263.

GOODE, J.—Appellants' main contention in this case is, that there was no contract between the parties for the sale of the corn which is the subject-matter of this controversy—no meeting of their minds in regard to the terms on which it was to be sold. In support of this position appellants say they ordered sound and dry corn, understanding that it was to be delivered to them in that condition at Jackson, Mississippi, regardless of the certificate of an inspector as to the condition it was in when inspected at St. Louis. That this is the position of the appellants appears from a letter addressed by them to the respondent on May 12, after the dispute had arisen as to what the contract was. An excerpt from that letter reads as follows:

"Your favor of the 11th to hand. . . . We are not dealing with the grain inspector of St. Louis, we are buying from you a specified quality of corn; you send the inspector's certificate as an evidence that you are shipping what we buy and you should not expect us to pay for the corn unless we get what we buy. If you allow the grain inspectors through carelessness, incapacity or corruption to ship or cause you to ship us rotten corn when we buy No. 2, you are solely responsible to us."

The important inquiry, therefore, is, whether the declaration of law given by the trial court that the letters and telegrams read in evidence made a contract of sale according to St. Louis inspection is correct? It will be observed from the letters quoted in the statement that differences had arisen between these parties concerning the condition of corn shipped by respondent to appellants and the terms on which it was sold prior to the dispute which gave rise to this case, and that in those letters the respondent, while allowing certain reclamations made by the appellants, informed the latter in unequivocal language that they did not consider themselves liable, would not pay any more such claims, and sold only on St. Louis inspection. In the letter of April 19, repondent says:

"We will allow you the grade of corn you order and use our best judgment to get you good corn, but you must take your chances."

And again in the letter of April 26:

"We can not quote you strictly dry 2 corn or 2 corn as you know there is none that is strictly dry and can only quote you by St. Louis inspection. We will do the best we can to give you dry corn, but we do not guarantee it."

On March 30, 1897, respondent had written to the appellants saying:

"We confirm sale to you to-day of about 1,000 bushels 2 white corn at 36 1-2 and 1,000 bushels 2 white corn 37, St. Louis inspection with invoices to be final as to condition and quality of corn."

Those letters were the basis on which the transactions, out of which the present controversy arose, were founded. Said transactions originated with the telegram of April 29, sent by the respondent to the appellants offering to sell No. 2 mixed corn at thirty-eight and one-half cents a bushel and white corn at forty-one and one-half cents a bushel, "same terms." The testimony shows without dispute that the words, "same terms," refer to the terms on which previous sales of corn had been made and the foregoing excerpts from the letters written by the respondent to the appellants make it certain that one of those terms was that the sale should be on St. Louis inspection. What then was lacking to constitute a contract and a meeting of the minds of the parties in regard to the carloads in controversy? The price, the grade of corn intended and by whom this grade was to be determined were all stipulated.

We have not noticed the letter written on the thirtieth day of April to the appellants, in which the respondent says it had accepted appellants order for three thousand bushels mixed corn on the same terms they had been selling before, but did not guarantee the corn to be dry, nor guarantee ap--

pellants against loss and that it would send a certificate of inspection with each car, because appellants claim they had made their order of April 29, before receiving that letter, as of course they had, and also claim they sent their telegram of May 1, giving another order, before receiving it, which is not so plain. It is said that in the course of mail the letter of April 30 would not reach Jackson in time to be answered on May 1, but we observe that respondent's above quoted letter of May 11 was received by the appellants and answered on the next day, May 12. Be this as it may, what is certain is that the appellants had previously bought corn from the respondent on an agreement that its quality was to be ascertained and fixed by an inspection at St. Louis and that they were offered this corn on the same terms. It is therefore our opinion that the position that there was no contract between the parties because the respondent offered to sell only according to St. Louis inspection and appellants never agreed to that term of the offer is untenable. This view is strongly corroborated by a telegram sent by Wilkinson & Company to respondent on May 5, after all respondent's terms were before them, which reads as follows:

"Jackson, Miss., May 5, 1897.
"Gratiot Street Warehouse Co.,
     "St. Louis, Mo.
   "No invoice. What on earth matter; entirely out, rush here.              "D. W. WILKINSON & Co."

In their letter of May 12 appellants assert they were being damaged by respondent's failure to fill its contracts to ship good corn and a claim for damages on this account was originally preferred by the appellants in their answer, thus recognizing the fact that contracts had been made.

Furthermore, appellants requested declarations of law based on the assumption that contracts for the purchase of

corn were made with respondent under dates of May 12 and April 19, 1897, but propounding the theory that the sales were executory until the corn had been inspected, accepted and paid for by appellants at Jackson, and that appellants had the right to reject it when it arrived there if it was in bad condition.

It is therefore apparent that at first the issue of fact between the parties was not whether there was a contract made by the letters and telegrams for the sale of the corn, or whether there was a misunderstanding about its terms; but whether the contract made by the letters and telegrams provided for a sale on St. Louis inspection or that appellants were to be allowed to examine the grain after it arrived at Jackson and reject it if it was unmerchantable.

The trial court declared the contract was for a sale on St. Louis inspection, and we think no other conclusion was possible under the evidence and that there was no room for a misunderstanding in view of the correspondence.

It is further urged that respondent, in its telegram of May 1, said nothing about an inspection or other terms of sale, but only quoted the price of corn and therefore the purchases made pursuant to that order can not be held to have been conditioned on a St. Louis inspection. But Guy Wilkinson, one of the appellants, testified the contract of May 1 was made on the same basis as the other; and indeed, considering the fact that respondent had repeatedly informed the appellant it would only sell according to St. Louis inspection, there can be no doubt that the order of May 1 contemplated that mode of fixing the quality of the grain.

That all the cars were examined was conclusively proven and certificates were issued by the inspector, stating they contained No. 2 corn, which was shown to mean sound and dry corn in the St. Louis market. No evidence was offered to impeach the inspection as dishonest or collusive and, hence, it is final as to the grade and quality of the corn shipped.

When a vendee purchases goods without first seeing them, he usually has the right to make an examination before accepting and paying for them to see if they are the kind he ordered. But if he makes an agreement by which a third person's decision on that point is substituted for his own, that decision is binding on him in the absence of fraud. Del Bondio v. Dold Packing Co., 79 Mo. App. (K. C.) 465.

Stress is laid on the circumstances that respondent consented to an examination of the grain in the cars at Jackson and had compensated the appellants for losses previously sustained on account of shipments of corn being partly of inferior quality, and the argument is made that those circumstances support the appellants' position concerning the terms of sale. They would support it, in some measure, if the correspondence left the question in doubt, but would certainly not be conclusive even then, and are of little if any weight when considered in connection with the letters and telegrams, which make an unambiguous contract, and with the oral testimony which explains the concessions. Previous claims by appellants for deductions from the purchase price of shipments had been paid under protest by the respondent, which had finally given notice that it would stand no more such demands nor be responsible for the quality of the corn when it reached Jackson. The language of the letters on this point is most positive, and the evidence is equally clear that appellants were permitted to examine the carloads in controversy merely to induce them to settle.

Appellants make the further point that the corn belonged to the respondent until they had paid the draft drawn on them for the purchase price attached to the bill of lading and sent to a bank in Jackson for collection, and that any change in its condition by which it became unmerchantable prior to the surrender of the bill of lading to the appellants by the bank, entailed a loss to be borne by the respondent as the owner and not by the appellants. This contention simply renews in

another guise the argument that the corn was to be accepted or rejected by the buyers after an examination in Jackson and could only be allowed by totally disregarding the contract that the corn was sold on St. Louis inspection, which contract, we hold, the lower court rightly found was made by the parties. We need not stop to inquire whether the title passed to appellants when the grain was delivered to the carrier in St. Louis to be transported to Jackson; it is enough that they had agreed to buy on St. Louis inspection. When that inspection had determined the grain was of the quality ordered, they became bound by their agreement to accept and pay for it when it reached Jackson and are responsible for the damages respondent sustained by their refusal to do so. The question is not concerning when the title passed, as it would be if the grain had been destroyed in transit, or if respondent was suing for the purchase price, but whether or not appellants kept their agreement to take it if the St. Louis inspector passed it as being of the quality ordered? They admitted they refused to take it and in defense of their refusal set up neither that the inspection was fraudulent, nor that the inspector did not certify it to be of the stipulated quality; but that they never agreed to buy on St. Louis inspection.

There was ample evidence to warrant the declaration of law given by the circuit court and its disposition of the cause; we therefore affirm the judgment. *Barclay, J.,* concurs; *Bland, P. J.,* dissents.