[No. 12996.   Department Two.   March 15, 1916.]

KLOCK PRODUCE COMPANY, Appellant, v. R. ROBERTSON
*et al., Respondents.*[1]

SALES—CONTRACT—CONSTRUCTION—QUALITY OF GOODS.  A contract for the sale of first government grade New Zealand creamery butter with government certificate attached to bill of lading, calls for grading in New Zealand and not for a Seattle or American certificate or grade.

ARBITRATION AND AWARD—CONTRACT — CERTAINTY — ENFORCEMENT. Under the rule that courts will not enforce contracts for arbitration where the intention is left in doubt, an agreement to arbitrate is not sufficiently clear to warrant enforcement, where, upon a sale of 1,500 boxes of first grade New Zealand butter, to be forwarded in five monthly shipments, the third shipment was found largely off grade and, the fifth shipment only remaining, the seller telegraphed offering to arbitrate in the event of the butter being off grade owing to keeping too long or improper handling, and the buyer replied requiring guaranty of payment in full at once for butter rejected by arbitrators, stating a preference to await arrival of butter and pay for that accepted, but finally did put up a letter of credit on receiving seller's reply "we agree to pay difference arbitrators decide on butter"; since it did not sufficiently appear what was to be arbitrated.

SALES—CONTRACT—MODIFICATION—ACQUIESCENCE IN DEPARTURE— EQUITABLE ESTOPPEL.  Where, upon the sale of first government grade New Zealand butter under that government's certificate, without any provision for an American inspection or certificate, the third shipment, though certified, was found to be largely off grade, the conclusiveness of the foreign government certificate as to grade is waived and the seller is estopped to insist upon the original terms of the contract, where he acquiesced in the buyer's contention that it was off grade, and departed from the original contract by agreeing that the defective boxes be set aside and sold at prices agreed to by the seller, and they were accounted for on that basis.

SAME.  The same would be true as to the fifth and last shipment which was partly off grade, and as to an agreement to arbitrate the differences, where the seller acquiesced in the claim that part was off grade, fixed the prices at which it was sold by the buyer, who accounted for such sales accordingly.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered May 8, 1915, upon findings in

[1]Reported in 155 Pac. 1044.

favor of the defendants, in an action on contract, tried to the court.    Reversed.

*Frank S. Griffith*, for appellant.

*Donworth & Todd* and *Earnest Eddy*, for respondents.

Holcomb, J.—After some preliminary negotiations, on October 3, 1913, appellant and respondents made a written memorandum of sale of a large quantity of butter to be shipped from New Zealand to Seattle.    The memorandum is as follows:

"Vancouver, B. C., Oct. 3rd, 1913.
"To Klock Produce Co., Seattle, Wn.
"We confirm sale to you to day of the following goods for account of ourselves
"1500 boxes (56 lbs.) First Govt. Grade New Zealand Creamery Butter free of preservatives at 13½d C. I. F. E. Seattle providing the freight rate is 1d    Should the freight rate be 1⅛d the price will be 13⅝d per lb. C. I. F. E.    Shipment monthly—October to February direct to Seattle via San Francisco.    Letter of credit to be put up covering each shipment by the buyers.    Government certificate attached to bill of lading.    Butter to be paid for in full as soon as cleared by U. S. Government inspection against preservatives.                         Robertson, Morris & Co.,
                         "Per D. Mahood.
"We accept and confirm the above order.
                "The Klock Produce Co.,
                     "Per H. L. Klock."

The evidence shows that, by first government grade New Zealand creamery butter, was meant and intended butter inspected and certified by an agent of the New Zealand government, first grade being butter scoring 88 points or over. It is shown that the abbreviation "C. I. F. E." meant and was intended to mean Cost, Insurance, Freight, and Exchange.    The paragraph in the memorandum, "Butter to be paid for in full as soon as cleared by United States Government inspection against preservatives," was inserted in the memorandum by the appellant after receipt by it from

respondents, but as so inserted was accepted by respondents.

There is some contention on the part of appellant that the clause in the memorandum "shipment monthly—October to February" did not mean to include any February shipment, but excluded that month, thereby making the contract mean that there were to be four monthly shipments. This contention, however, is not sustained, inasmuch as appellant itself, by H. L. Klock, in one or more letters, clearly stated that a shipment would be expected in February, thus showing that he understood the contract to be and to mean that there were to be five monthly shipments.

It is contended, also, by appellant that the butter was to be first-class at Seattle for the Seattle market. Such was the testimony of the appellant's principal witness, Mr. Klock, at the trial.

Generally speaking, the cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. The parties should be bound for what they intended to be bound and no more. The law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest. 6 R. C. L. 835. But it cannot be considered that the meaning or intent of one of the parties only would guide in the construction of the contract. From the memorandum itself it is easily ascertained that the grading referred to in the contract as first government grade New Zealand creamery butter is not to refer to first grade butter as established at Seattle. The memorandum provides that a government certificate shall be attached to the bill of lading. There could be no other government certificate attached to a bill of lading originating at the point of shipment, which was in New Zealand, than a government certificate of New Zealand. There could be no Seattle or American certificate there attached. Furthermore, there is testimony on the part of both a witness for appellant and witnesses for respondents that "first govern-

ment grade New Zealand creamery butter" means a grade fixed under the authorization of the government of New Zealand showing that the butter so graded scored 88 points or over.

The shipments were made at the times agreed. Complaint was made of the third shipment, shipped from New Zealand about December 6, 1913, and arriving in Seattle early in January, 1914, that 289 boxes of the butter of 56 pounds each were below the grade required. The fifth shipment from New Zealand, about the last of January, 1914, arriving in Seattle in February, was asserted by appellant to contain 355 boxes of 56 pounds each that were below quality. As to the first shipment complained of, the 289 boxes, there were 147 boxes scoring 88½, 101, scoring 89, and the rest scoring something over 90, as shown by the New Zealand certificate of inspection. There was no complaint of the fourth shipment, but before the arrival of the fifth shipment, appellant refused to put up the letter of credit required under the contract to cover each shipment, and, in reply to objections made to them, respondents sent appellant the following telegram:

"Jan. 31, 1914.

"Klock Produce Co., Seattle.

"Referring to 1500 boxes butter sold you for shipment by Moana January 31, in the event of the butter being off grade owing to having been kept too long or improper handling other than through defective transportation insurance covers latter we agree to submit to arbitration you appointing one man we appointing one they to choose third. Arrange letter of credit immediately."

To which appellant replied as follows by telegram:

"Jan. 31st, '14.

"Robertson, Morris & Co., Vancouver, B. C.:

"Before we place letter credit must have guaranty we will be paid in full at once for butter rejected by said committee or that you will pay difference of damage. You say you will submit to arbitration but do not say that you will make good the difference in money. We prefer wait arrival

butter paying only for that accepted. You and McEwan handle balance if any."

To this respondents replied by telegram as follows:

"January 31, '14.
"Klock Produce Co., Seattle:
"We agree pay difference arbitrators decide on butter Try get bank send credit today. This most important Notified McEwan credit being arranged."

The McEwan referred to in these communications was the New Zealand shipper of the butter.

Upon the understanding arising under these telegrams, appellant put up the letter of credit required under the contract, received the fifth shipment, and thereafter received and tested the shipment and found, as claimed by it, as stated heretofore, 355 boxes of butter below quality.

The issues as constituted by the pleadings in the cause are somewhat vague and perplexing. Appellant, without so stating, apparently relies upon a modification of the original contract by telegrams and letters and other oral communications between the parties. Respondents alleged and contended that the telegrams constituted an agreement in writing to arbitrate the differences between them, and that they appointed, or offered to appoint, their arbitrator, but that appellant refused to appoint any arbitrator except one Klock, a brother of the president and general manager of the appellant company and also a stockholder therein, and that, by reason of such conduct, there had been no arbitration, but that the agreement to arbitrate was duly made and should be enforced. With this the trial court seemed to agree. The trial court made a finding to the effect that respondents "offered to appoint an arbitrator, but the plaintiff suggested as its arbitrator one Klock, who is the brother of the manager and president of the plaintiff, and a stockholder in the plaintiff corporation, and has failed and refused to appoint any other arbitrator."

Appellant stated its causes of action apparently in one cause of action in seven paragraphs. It alleged the original contract, the shipment of the several shipments of butter, and the defective quality of the 289 boxes in the third shipment, alleging damages by reason thereof in the sum of $1,391.64; alleged the defective quality of the 355 boxes in the fifth shipment, and its damages by reason thereof in the sum of $1,742.92. It also, in another paragraph, set up the telegrams heretofore quoted, and alleged that the respondents refused to appoint an arbitrator or committeeman, rendering this action necessary; and that by reason of respondents' failure to deliver first grade New Zealand creamery butter according to their contract, loss and damage in the sum of $3,136.56 has been suffered. Another paragraph alleged damages in the sum of two dollars, balance due for money paid at the request of respondents to a chemist for having certain quantities of the butter analyzed for the detection of preservatives. Different constructions were placed by the parties themselves upon the telegrams referring to the matter of arbitration. Respondents contended that the telegrams meant only that they would arbitrate if the butter referred to by appellant on January 31, 1914, was off grade owing to having been kept too long, or from improper handling other than through defective transportation which insurance covered. They contend also that it refers only to the last shipment to be shipped from New Zealand on about January 31, 1914, and of this we can see no doubt. Appellant, on the other hand, contends that the telegrams constituted an agreement to arbitrate all the differences between the parties, including the 289 boxes in the third shipment.

"Courts will enforce contracts to arbitrate disputes and make the decision of arbitrators final where the parties to a contract make it clearly to appear that such was their intention; but whenever they leave it doubtful whether such a method of settling a disputed question was intended to be

left to the final decision of arbitrators, the construction is in favor of the right to resort to the courts for redress in the usual manner." *Van Horne v. Watrous*, 10 Wash. 525, 39 Pac. 136.

See, also, *Tacoma R. & Motor Co. v. Cummings*, 5 Wash. 206, 31 Pac. 747, 33 Pac. 507.

There is too much uncertainty about these telegrams as to what is to be arbitrated for the courts to attempt to enforce it as an agreement to arbitrate. If it were first to be determined whether the butter was off-grade owing to having been kept too long, or from improper handling other than through defective transportation, then it would appear there was nothing to arbitrate.

Had respondents stood upon the letter and terms of the memorandum of sale, there is no doubt whatever appellant could not recover. Appellant bought a certain article the quality of which was to be determined in a certain way; that is, by a certificate of government grade of New Zealand. There was no provision for inspection and certifying the grade in Seattle or by American inspection. When a certain method of ascertaining the quality of an article sold is provided by the parties, that method is conclusive and binding upon the parties. *Gratiot St. Warehouse Co. v. Wilkinson*, 94 Mo. App. 528, 68 S. W. 581; 35 Cyc. 316. But respondents did not adhere to the original terms of the contract, but, at the instance of appellant, departed therefrom and acquiesced in the contention of appellant that the third shipment contained 289 boxes of 56 pounds each of butter of defective quality. By agreement between them, the appellant set aside these 289 packages, and respondents then endeavored to sell them. They succeeded in disposing of forty packages to one concern, receiving the money for them and remitting the amount thereof to appellant. They also authorized an agent to make further effort to sell the butter, which effort failed. They then authorized and requested appellant to make sale of it for the best price obtainable. Ap-

pellant thereupon sold it for from 22 to 23½ cents per pound, and accounted therefor to respondents. The total loss on this shipment is shown to be $1,391.64.

As to the fifth shipment, of which the 355 boxes were claimed to be defective, although the argument of counsel for appellant is somewhat involved, as we gather, it is contended that, even though the agreement to arbitrate was not a sufficient agreement to arbitrate, it was a sufficient acquiescence in the contention of the appellant that the 355 packages of butter were defective in quality to constitute a departure from the original contract by which the certificate of grading by the New Zealand inspector would control, and create a new contract of liability. We are satisfied that such position was correct. Had the agreement to arbitrate been effected, it would have been for the express and only purpose of determining whether or not the 355 boxes of butter contained any butter of defective quality. But the agreement was not effected. On the contrary, it was abandoned. The tentative agreement to arbitrate referred to this shipment alone, and had nothing to do with the previous shipments. We must agree with the trial court that it was possibly prevented by the conduct of Klock alone in insisting on appointing an arbitrator who would be disqualified under the law by reason of his interest and bias, and objecting to respondents appointing any arbitrator, although not interested in the matter, who had in any way prejudiced the controversy.

Notwithstanding the respondents had departed from the contract and acquiesced in the rejection of the 289 boxes contained in the third shipment, they now proceeded to the negotiation with appellant for the disposition of the 355 boxes contained in the last shipment. It seems that they were doing everything within their power to satisfy appellant. One of the respondents came to Seattle upon notice of the rejection of the 355 boxes of butter, and first suggested that he would ship all of it to Brandon, B. C., where he had

a customer for a large quantity of butter. Later, however, it was discovered that he could not get the duty refunded if the butter was so shipped and, at his suggestion and request, the butter was placed by appellant in cold storage, where it was kept until respondents took 200 packages at twenty-five cents per pound and 120 packages at twenty-four cents per pound, and the balance was sold by the appellant for the respondents at different prices, and accounted for. The respondents fixed the prices of this butter and established the loss thereon. After such disposition of the butter in the fifth shipment, there was a loss of $1,742.92. There was a further sum of two dollars paid out by appellant, as before stated, for analyzing the first 289 boxes of butter or a part of them. There is ample evidence, and the trial judge observed, that the butter in the two shipments complained of was very poor in quality. We are of the opinion, therefore, that respondents are estopped to rely upon the original contract, and that the original contract was so modified by the parties after its partial performance that the appellant is entitled to recover.

The judgment is therefore reversed, with instructions to enter judgment for appellant.

Morris, C. J., Bausman, Main, and Parker, JJ., concur.