[No. 13740.   Department One.   September 17, 1917.]

## M. M. DICKSON, *Respondent*, v. D. DARNELL *et al.*, *Appellants.*[1]

CONTRACTS—TERMS—EVIDENCE OF AGREEMENT—SUFFICIENCY. Under an oral contract pursuant to which plaintiff was to purchase war horses for defendant who had a contract with the French government for horses of three designated classes, the evidence shows that the agreement was that the horses should pass inspection by the French officers, where it appears that plaintiff knew that the horses were for the French government and to be inspected by representatives of that government, there was evidence that he was informed that they were subject to such inspection and plaintiff awaited such inspection during a month's delay and made no demand for acceptance without inspection and made no objection until after rejection by the French inspectors.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered May 22, 1916, upon findings in favor of the plaintiff, in an action on contract, tried to the court.   Reversed.

*Post, Russell, Carey & Higgins*, for appellants.
*Merritt, Lantry & Merritt*, for respondent.

ELLIS, C. J.—Action for $1,046.50, with interest, claimed to be due under an oral contract pursuant to which plaintiff purchased for defendants certain horses for resale to the French Republic.   Defendants counterclaimed, demanding a judgment against plaintiff for $1,303.65, with interest.

The main controversy, as we view it, relates to the terms of the contract.   It is not controverted that the horses were

[1] Reported in 167 Pac. 937.

to meet certain specifications, but plaintiff claims that there was no agreement as to who should determine whether in fact they did so or not, while defendants claim that it was agreed that the French inspectors should be the final arbiters of that question.

Since shortly after the outbreak of the present war in Europe, defendants have been furnishing, under contract, horses to the French government. Their mode of operation was to select some center, as in this instance Spokane, as a purchasing point. They would then deposit in some bank money estimated to be sufficient to meet purchases in the surrounding territory. Local horse buyers would then be employed to canvass the region and purchase horses, paying therefor by checking on defendants' bank account.

In the early part of 1915, defendant Darnell, representing his firm, came to Spokane, made the necessary banking arrangements with the Spokane & Eastern Trust Company, and through one Smith, assistant cashier of that bank, got in touch with certain local horsemen, among them the plaintiff. Plaintiff had been dealing in horses for years, and just prior to this time had been buying for one Franchen, who was collecting horses in the vicinity of Spokane for defendants. Plaintiff, desiring to deal with defendants direct, sought the introduction to Darnell through Smith. Smith and several horse buyers besides plaintiff were present when the oral contract between plaintiff and Darnell was made. Darnell told plaintiff what the specifications were for three classes of horses, known as Class "AA," Class "A," and Class "C." Plaintiff claims that, at the time, he made a notation of these for his own convenience, but the memorandum was not produced at the trial. Since there is no material controversy as to what these specifications were we shall not set them out. Darnell testified, and the fact is not disputed, that they were the specifications furnished him by the French government. The horses of whatever class were to be sound and without blemish. It was agreed that plaintiff was to

purchase horses meeting these specifications, and he was authorized to pay for them by drawing on defendants' bank account. He was personally to pay his own incidental expenses. Defendants were to pay the freight on all horses purchased by plaintiff and accepted if they were billed direct to Jersey City, N. J., with a provision for unloading at Spokane for inspection. For all horses meeting the specifications, defendants were to pay plaintiff agreed prices per head as follows: Class AA, $155; Class A, $135, and Class C, $110. Plaintiff's compensation was to be the profit he could make by purchasing horses below these agreed prices. Up to this point there is practically no disagreement as to what the contract was. We shall later notice the evidence as to inspection.

Plaintiff bought forty horses, issuing in payment checks aggregating $4,133.50 against defendants' bank account. The last bunch of these horses was shipped to Spokane about November 26 or 27, 1915, where they remained in plaintiff's custody. He paid the expenses of their care by drawing on defendants' bank account. About December 20th, and again about a week later, representatives of the French government made two inspections of the horses and accepted in all twenty horses as being within the specifications. These were classed and priced as follows:

| | |
|---|---:|
| 3 Class AA at $155 each............ | $465 |
| 11 Class A at $135 each.............. | 1,485 |
| 6 Class C at $110 each.............. | 660 |
| Total......................... | $2,610 |

The remaining twenty horses were rejected. Plaintiff claimed that the horses were up to the specifications and should have been accepted Defendants claimed that the French inspection settled that matter. Meanwhile the horses were being kept at Spokane at plaintiff's charge for feed and care. Finally, a stipulation was executed on January 14, 1916, under which defendants deposited $1,250 with the Spokane

& Eastern Trust Company to secure plaintiff, and the re-
jected horses were surrendered to the defendants and subse-
quently sold at public auction for $1,190.   Plaintiff's claim
in this action is that all of the forty horses should have been
accepted and so classified as to make at the agreed prices, an
aggregate value of $5,180, and that he was entitled to
$1,046.50, the difference between that aggregate and the
$4,133.50 which he paid for the horses by checks on defend-
ants' account.

At the trial it was admitted that one horse, for lack of
height, did not come within the specifications.  Both parties,
between the time of the last French inspection and the sale
of the rejected horses, had the rejected horses examined by
experienced horsemen who testified at the trial.   Much evi-
dence was introduced as to whether, in the opinion of these
witnesses, the rejected horses met the specifications, but, as
we view the case, it is not necessary to examine this evidence
in detail.

The court found that thirty-nine of the horses were within
the specifications and should have been so classified and priced
as to give a total value of $4,965.   He further found that
the remaining horse was of the value of $130, making the
value of all of the horses $5,095.  Deducting the $4,133.50
paid for the horses, the court concluded that plaintiff was
entitled to judgment for $961.50.   Judgment went accord-
ingly.   Defendants appealed.

As before stated, appellants' main contention is that it
was understood from the beginning that the decision of the
French inspectors should be final as to whether the horses
came up to the specifications.   We regard this as the crucial
question in the case, and we shall, therefore, discuss the evi-
dence touching it in some detail.

Respondent testified that he was to take care of the horses
that did not come up to specification, that he was to take
them, pay for them and keep them, repaying the money he
had paid for them, together with freight and feed up to the

time they were ready for delivery. At first he testified in substance that he did not know the horses were being purchased for resale to the French Republic, and that nothing was said as to who should inspect them. Though his testimony on this point was reluctantly given, he finally admitted that he had learned before he entered into the contract that appellants were buying horses for the French government, and that he supposed some one representing the French government would come and inspect them. His own testimony convinces us that he knew the horses were being purchased for resale to the French government and were intended for use in the war, and that he must have known that they would not be accepted for the purpose for which they were bought unless passed by the inspectors for the French government. One DeSpain, a silent partner of respondent, who purchased most of the horses and testified that he was to get a share of the profits, testified that he also had formerly purchased for Franchen and at the time understood that he was buying for the French government, and that Franchen gave Darnell checks for the horses; that, when buying for Dickson, he knew that Dickson had an arrangement with Darnell, Love and Meek, and that they were buying for the French government. DeSpain had nothing to do with the making of the contract and was not present when it was made. It is clear that his information as to the matter was secured from respondent. One Hunter, a horse buyer, who was present when the contract here involved was made, testified that he was interested in this case because he had a case pending against appellants involving the same question, and admitted that, either before or at the time of the meeting when the contract was made, the buyers present were told that French inspectors would come to inspect the horses and that those that were accepted would go on and those that were not accepted would not go on. Smith, who was present when the contract was made, testified that, in the conversation, it was stated that the horses were to be examined by

French inspectors. He also was interested, in that he had an agreement with respondent, made in consideration of his introduction of respondent to Darnell, to receive from respondent $3 per head for the horses inspected and accepted by the French inspectors. Appellant Darnell, in response to a question by the court as to what was said about inspection, stated:

"The conversation was nothing more than that these horses were to be bought and brought here and inspected by the inspectors of the French Republic. . . . It was mutually understood, as far as I knew."

and again:

"Q. Who was to determine whether a horse was class 'C,' or 'A' or double 'A,' or any other class? A. The French inspector, of course."

and again on cross-examination:

"Q. As I remember your testimony, you don't remember that there was anything mentioned at the time you were talking with Mr. Dickson, that the horses must be inspected by the French inspectors? A. That was the understanding, that they were to be inspected by the French inspectors. Q. How did it become the understanding? A. Because Mr. Dickson knew we were handling horses to be placed before the French inspectors."

Finally, the court, seeming still in doubt as to what he had said, remarked:

"The Court: I understood that he did not remember anything specifically being said as to who was to pass on the class 'A' or double 'A' or 'C' grade of horses. Mr. Post: That is not the way I understood him. He said that only as to the rejects, what was to be done with them. The Court: What did you say on that subject, Mr. Darnell? A. I said that as far as the inspection was concerned, that the horses were all to be passed on by the inspectors of the French Republic. Mr. Post: Did you say that to Mr. Dickson or not, did you tell him that? A. Yes, sir, I never said anything else to any one, except that the inspection would be by the French inspectors. I never had inspected any horses for any one.

Q. I am not asking what you said to anybody except to Mr. Dickson. A. Yes, sir. He knew they would be inspected by the French inspectors. The Court: I understood you to say that you did not remember anything specifically that was said about the inspection of these horses and their grading into the 'A,' double 'A' and 'C' classes; now perhaps I misunderstood you? A. Well, that classification was in the specifications, your honor; I gave him the specifications of the different classifications, as nearly as I could give them. Mr. Post: I did not hear him say what your honor suggested. The Court: I may have misunderstood, but that is the way I got it. A. I gave Mr. Dickson all the information I could in regard to the best class of horses to buy, as nearly as I could, what would be liable to be accepted."

The contract being oral and its terms disputed, it is elementary that the intention of the parties must be ascertained not only by their testimony, but by considering that testimony in the light of the surrounding circumstances and the purpose of the contract at the time it was made and the conduct of the parties before the dispute arose. These things must be considered as to showing the probability as to what the contract was. *McCowan v. Northeastern Siberian Co.*, 41 Wash. 675, 84 Pac. 614. The parties were experienced horsemen, dealing at arm's length. They undoubtedly knew that the question whether the horses came up to the specifications would be a vital matter to both parties. That it is a debatable question is glaringly evident from the testimony of some thirteen witnesses who testified in this case.

That an inspection of the horses for the purpose of determining whether they met the specifications was intended is further shown by the fact that, after their arrival in Spokane, respondent waited nearly a month for the arrival of the French inspectors. During this delay he did not inform appellants that he was not concerned with the inspectors and would not be bound by their decision, as he now claims. Neither did he demand that appellants accept the horses as meeting the specifications, nor that appellants inspect the horses themselves. He was present at the French inspection

for at least a part of the time, and his silent partner, De-Spain, was present at both inspections and assisted therein. Not until after the final inspection and the rejection by the French inspectors of the twenty horses did respondent assert that no inspection was agreed upon. Weighing all of the evidence in the light of these circumstances, and considering the very purpose of the contract and of the known use to which the horses were to be put, we cannot escape the conclusion that it was understood from the beginning that the horses purchased were to be subject to the French inspection which was to be binding upon both parties. Though the findings of the trial court are entitled to great weight, the case is here for a trial *de novo*, and we are constrained to the view that the evidence preponderates against the findings of the trial court on this question.

It is a well established rule that, where parties to a contract of sale agree that the quality of the thing sold shall be determined by an inspection to be made by a particular person, or a person holding a particular position, such determination is conclusive upon the parties and cannot be impeached except for fraud, collusion or palpably arbitrary action: *Canton Lumber Co. v. Liller,* 107 Md. 146, 68 Atl. 500; *Nofsinger v. Ring,* 71 Mo. 149, 36 Am. Rep. 456; *Del Bondio v. Dold Packing Co.,* 79 Mo. App. 465; *Chapman v. Kansas City, C. & S. R. Co.,* 114 Mo. 542, 21 S. W. 858; *Savercool v. Farwell,* 17 Mich. *308; *Texas Star Flour Mills Co. v. Moore,* 177 Fed. 744; *Citizens' Independent Mill & Elevator Co. v. Perkins* (Okl.), 152 Pac. 443; *Lucas Coal Co. v. Delaware & H. Canal Co.,* 148 Pa. St. 227, 23 Atl. 990; *Empson Packing Co. v. Clawson,* 43 Colo. 188, 95 Pac. 546; *Brooke v. Laurens Milling Co.,* 78 S. C. 200, 58 S. E. 806, 125 Am. St. 780; *Gratiot St. Warehouse Co. v. Wilkinson,* 94 Mo. App. 528, 68 S. W. 581; 35 Cyc. 227, 228.

Respondent does not attack, either by pleading or evidence, the fairness of the inspection made by the French inspectors. Apparently he has elected to stand or fall by his

assertion that there was no intention that he should be bound by it. That the decision of the French inspectors was not in fact arbitrary is strongly supported by the widely divergent views of the several experts who examined the horses as to whether or not they met the specifications. It is true that no one testified in specific terms that there was an express agreement that the French inspection should be final and conclusive. That, however, is a matter of intention to be gathered from all that was said and done and from the circumstances and purpose of the agreement. It would be an idle thing for the parties to have made an arrangement for the inspection, as is clearly borne out by this record, if the result could be set aside upon the mere assertion of one of the parties that he would not be bound by it. *Chapman v. Kansas City C. & S. R. Co.*, and *Savercool v. Farwell, supra.*

Appellants, in their answer, alleged that they have paid $770.15 for freight, feed and care of the horses. This allegation was clearly made with reference to both accepted and rejected horses. The only testimony as to such expense was that of respondent. He stated that he had drawn on appellants' bank account in the sum of $618.05 to pay for the feeding and care of the horses after their arrival in Spokane. There was no evidence whatever as to what was expended for freight. There is no evidence or admission in the pleadings from which we can determine with absolute accuracy the cost of caring for the twenty rejected horses, which, in the absence of testimony as to freight, is the only expenditure chargeable to respondent. We shall assume, therefore, that of this $618.05 which respondent paid out of appellants' money, one-half should be chargeable to the care of the twenty rejected horses. As before stated, respondent paid of appellants' money for the purchase of the forty horses $4,133.50. Add to this one-half of the expense for care and feeding, $309, makes a total of $4,442.50. Twenty horses were accepted, at an aggregate valuation of $2,610, the remaining twenty were sold at public auction for $1,190, mak-

ing a total of $3,800 to be credited to respondent. Appellants are entitled, therefore, to recover on their counterclaim the difference between these amounts, or $642.50. Appellants are entitled to withdraw the deposit made under the stipulation.

The judgment is reversed, and cause is remanded with direction to enter judgment in accordance with this opinion.

MAIN, CHADWICK, and WEBSTER, JJ., concur.